UNITED STATES of America, Plaintiff–Appellee,

v.

Eddie FRYER, Defendant–Appellant.

No. 91–1398.

United States Court of Appeals, Seventh Circuit.

Argued April 16, 1992.

Decided Sept. 2, 1992.

---

Barry R. Elden, Asst. U.S. Atty., Criminal Receiving, Appellate Div., Diane MacArthur (argued), Office of U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Martin S. Agran (argued), Agran & Agran, Chicago, Ill., for defendant-appellant.

Before BAUER, Chief Judge, FLAUM, Circuit Judge, and WOOD, JR., Senior Circuit Judge.

BAUER, Chief Judge.

During a seven-week period in late 1989, early 1990, three bank robberies occurred in Chicago under strikingly similar circumstances. The first, on November 16, 1989,

took place at the federally insured Community Bank of Edgewater (Edgewater). Stella Tsipas, a teller, was at work at her assigned window. A man she later described as a light-skinned black standing about five feet eight or nine inches tall, wearing a brown leather jacket, approached her window and asked for quarters in exchange for a five-dollar bill. He stood approximately two feet away from her at the time. Robyn Wilson, the teller at the next window, returned from her lunch break at about the same time and observed the transaction. She noticed a man, who was not a regular customer of the bank, leaning in an exaggerated manner against Tsipas's window, watching what she was doing as she opened her cash drawer. After Tsipas gave the man the quarters, Wilson saw him walk away. During the time he was at Tsipas's window, she could see his face clearly.

About a half an hour later Wilson saw the same man, whom she described as a light-skinned black, five feet eight or nine inches tall, wearing a brown leather jacket with red and green patches on it, standing five to six feet away in the customer line again. When it was his turn, he approached her window and, standing about a foot to a foot and a half away, asked her for twenty singles in return for a twenty dollar bill that he passed to her. Wilson took the bill, set it to one side, and reached into her cash drawer for a stack of singles. As she was counting out twenty one-dollar bills, the man kept putting his right hand into his pocket and removing it. She made eye contact with the man and "gave him a real hard look" to let him know that he was frightening her. He didn't stop, however. When she finished counting, she passed the singles to him.

Thinking her business with the customer was completed, Wilson began to walk away from her teller window, but the man pulled out a black gun that to her appeared to be chipped. He instructed her, "Be quiet. Don't move. Open the bottom drawer. All of it." She complied, opening her bottom drawer and removing all of the counted and strapped money. She told the man she had no more money, but he repeated he wanted all of it. She then opened her top drawer and gave the man two stacks of single dollar bills. The man put the money, $2,643, in a grocery store plastic bag and walked away from her teller window. As he did, Wilson activated an alarm with her foot.

The bank's security video camera recorded these events as they occurred. Additionally, Tsipas and Kshitij Vasavada, a supervisor at Edgewater Bank, witnessed them. Tsipas heard Wilson's customer ask for change for a twenty dollar bill; when she looked over, Tsipas recognized the man as the person who earlier bought five dollars worth of quarters from her. After she turned back to the business at her own window, Tsipas heard the man tell Wilson he wanted "all of it." She then looked over at Wilson, and saw her take money out of her drawer and give it to the man.

As Vasavada passed behind Wilson in the tellers' area, he heard someone say "give me all of it." Vasavada looked toward the person at Wilson's window, about four or five feet away, and saw a man he later described as a five foot eight or nine inch tall black man with large eyes and spotty skin, wearing a black or gray jacket. Vasavada walked to the teller window on the other side of Wilson, seven to eight feet from the man, to get a better look at him and to set off an alarm. Once there, he got a good look at the man's face, and even made eye contact with him. He then saw Wilson give the man money from her drawer, and he saw the man put it into a bag and run out of the bank.

When police and agents from the Federal Bureau of Investigation (FBI) arrived, they interviewed Tsipas, Wilson, and Vasavada. Each gave the above descriptions of the robber. During their interviews, Vasavada and Wilson viewed the bank's security videotape. While viewing it, Wilson remarked "there he is." Tsipas later viewed a photograph made from the videotape.

The second bank to be robbed was the North Devon Avenue branch of Citicorp Savings of Illinois (Citicorp), on December 1, 1989. Teller Corey James noticed a

black man waiting in the customer line, an occurrence he considered unusual because there were not many black people in the bank's neighborhood. When it was the man's turn, he approached James's window and asked for change for two one-dollar bills. James looked down to open his cash drawer to get the change, and when he looked up he was looking at the barrel of a shotgun. The man also held a grocery store plastic bag. The man said "fill up the bag and hurry up and don't make me use this." As he said this, the man pressed his body up against the counter, leaning over it. James began to put small bills into the bag, but the man said "no, no. I want the big money, you know, fifties and hundreds. Hurry up." James then filled the bag with the cash at his station as well as treated "bait money," totalling $16,670. When James finished, the man snatched the bag and quickly walked out of the bank. James activated an alarm and flagged down a police officer outside the bank.

While the robbery was in progress, the bank's security system videotaped it. And as at the Edgewater Bank, another teller witnessed it. Daniel Barreto was counting coins at a machine a few feet away from James at the time. While standing there, Barreto saw James stuffing money into a Jewel Food Store plastic bag, then saw a man grab the bag and run out of the bank. Before he left James's counter, however, Barreto got a look at the man's face, even making eye contact with him.

When police and FBI agents arrived, James described the robber as a light-skinned black man with a thick reddish-brown moustache wearing a brown bomber-style jacket. Additionally, James told them the robber stood about six foot one or two inches tall and had hair that appeared to be chemically treated. Barreto described him as a tall, slender, unshaven, curly haired white man with a moustache, wearing a brown bomber jacket with patches on it. Both tellers viewed the security video immediately after the robbery, and both saw the man who robbed James.

The third robbery occurred on January 8, 1990, at the Pathway Financial Bank (Pathway) on South Pulaski. Teller Rita Reardon was working the express line that day, and while helping an elderly woman she noticed a man standing in her line behind the elderly woman. He stood about four feet away from her, unobstructed from her view by the elderly woman. She did not recognize the man as a regular. She thought he looked a little strange, creepy, because of his mannerisms as he stood in line. She looked at him for a while and made eye contact, but then looked away. She described him as a light-skinned black man wearing a brown jacket with a multi-colored scarf. She noticed that he had black hair that was frazzled and had an orange-blond cast to it, as if it had been highlighted.

When teller Mark Ruhnke opened up his window, the customer stepped from Reardon's line to Ruhnke's window. Ruhnke had seen the man earlier as he stood in Reardon's line. The man asked Ruhnke for ten singles in exchange for two five-dollar bills. Ruhnke took the two bills and set them aside, then opened his cash drawer and counted out ten singles. As the man stood at Ruhnke's window he was between a foot and a foot and a half away. Ruhnke saw his face clearly, and made eye contact with him. As Ruhnke handed the man his singles, he saw the barrel of a gun, a long silver barrel with notches on the inside. The man also held a grocery store plastic bag, and said, "Sir, I am robbing you. Would you place all the tens and twenties into the bag?" Ruhnke completed counting out the ten singles for the man and pushed them toward him. As the robber said, "Sir, I am not joking. This is a robbery. Put all the tens and twenties in the sack," he exposed a little more of the gun for Ruhnke to see. So Ruhnke removed a stack of twenties from his cash drawer, which the man took from him and put into the bag. The robber then asked for the fifty and one hundred dollar bills. When Ruhnke complied, the man took the cash and put it into the bag. Finally, Ruhnke picked up "bait money" to hand to the robber, but he had already turned and

was walking away. He had $5,719 of the bank's money in the bag. Reardon saw the "creepy" man run past her and out the door. When she walked up to Ruhnke, he said "I've been robbed." Someone sounded an alarm.

When police and FBI agents arrived, Reardon gave the above description of the robber. Ruhnke's was similar: a light-skinned black man wearing a brown jacket with patches on it, and a fringed scarf. He also noticed that the man had a red, puffy cut underneath his right eye that he tried to shield when he saw Ruhnke look at it. Although this robbery also was videotaped, agents showed Ruhnke a photograph from one of the earlier robberies and when he saw it, Ruhnke said the man in the photo looked like the man who robbed him. Several days to a week later, agents showed Reardon a photograph made from the videotape of the Pathway robbery.

On the evening of January 29, believing that they had the man who pulled off the Edgewater–Citicorp–Pathway robberies in custody, agents assembled a six-man lineup at the Chicago Area Six Police Station. Six of the seven witnesses attended: Tsipas, Wilson, and Vasavada from Edgewater; Barreto from Citicorp; and Ruhnke and Reardon from Pathway. All of them identified one of the lineup participants, defendant Eddie Fryer, as the man who robbed their banks. Vasavada, Barreto, Ruhnke, and Reardon recognized Fryer immediately. Tsipas waited until she viewed all the participants, although she said she "figured" Fryer was the robber when she walked into the lineup room. Wilson identified Fryer while viewing the lineup. After the lineup procedure was concluded, officers took a photograph of its participants, standing in the same order in the photo as in the lineup itself. Then they took a photograph of Fryer, alone.

Chicago Police had taken Eddie Fryer into custody that day after an incident that began as a routine stop for an illegal traffic maneuver. At 2:30 a.m. on the 29th, veteran police officer Sergio Gonzalez and probationary officer Kevin Fahey were on routine patrol in the Uptown neighborhood, an area where gangs have been active, when they saw a Buick Electra make a right turn on a red light without first coming to a stop. The officers turned on their squad car's flashing Mars lights and pursued the Buick for one and a half to two blocks until it pulled over to the curb. During that brief pursuit, they noticed certain movements between the driver, Eddie Fryer, and his passenger that suggested the Buick's occupants were attempting to conceal something before stopping their car. Gonzalez, concerned that the occupants might have been trying to hide a weapon, cautioned Fahey to be careful during the stop.

Once the Buick stopped the movements between its two occupants continued until Gonzalez, using his squad car's loudspeaker, instructed the two to raise their hands where the officers could see them. They complied. The officers then got out of their car and approached the Buick. Gonzalez instructed its occupants to get out of their car. They did. The officers then conducted a pat-down search of them both, which disclosed no weapons. Gonzalez instructed Fahey to watch the two while he searched the interior of the Buick. In the glove box, Gonzalez found a loaded snub-nosed revolver, its serial number obliterated. With that, the officers arrested Fryer and his passenger, advising them of their rights.

Later that day, an anonymous telephone caller informed FBI agents that Eddie Fryer had been bragging about having committed a bank robbery. The caller gave Fryer's address as 951 Agatite on Chicago's north side. Agents went to that address, where they observed Fryer's car parked near the building's entrance. Through the windows of the car Agent John Conditt saw a scarf laying on the floor. The scarf appeared similar to the one the robber wore during the Pathway robbery. Agents then went to Fryer's apartment and obtained Mrs. Fryer's written consent to search the residence and the car. During the search they found a brown leather jacket, a live .12 gauge shotgun shell, and a state court parole document bearing Fryer's name. They also

found a photograph of Fryer, taken on January 4, 1990, that showed a cut under his right eye, marked by redness and swelling around the cut and on both sides of his nose.

On February 27, 1990, the Special May 1987 Grand Jury charged Eddie Fryer in a seven-count indictment with violations of 18 U.S.C. §§ 922(g), 924(c), 2113(a), and 2113(d). Counts one, three, and five of the indictment allege that Fryer took by force and intimidation a total of approximately $25,032 from three banks in Chicago, Illinois, between November 16, 1989 and January 9, 1990, and that a dangerous weapon was used in the commission of each offense. Counts two, four, and six allege that Fryer used a firearm in the commission of a crime of violence, specifically, each of the three robberies. Count seven alleged that on the date he was arrested Fryer, a convicted felon, was in possession of a firearm.

Fryer pleaded not guilty and filed a series of motions to suppress. After hearings on each, the district court denied Fryer's motions. A jury trial commenced on October 3, 1991, at the conclusion of which the jury found Fryer guilty on counts one, two, three, five, and six, and not guilty on counts four and seven. Four months later, the district court sentenced Fryer to a term of 562 months imprisonment to be followed by three years of supervised release.

On appeal, Fryer presents a multiplicity of challenges grouped in three clusters: to the district court's pretrial rulings, to his conviction, and to his sentence. We affirm.

## I.

■ Fryer grounded his motion to suppress the gun seized from the car on the officers' lack of probable cause. He asserts here that the district court erred in denying that motion because the stop, he argues, was clearly pretextual. Our review is for clear error. *United States v. Spears*, 965 F.2d 262, 269 (7th Cir.1992). Fryer's challenge succeeds only if we are left with the definite and firm conviction that a mistake has occurred. *United*

States v. Cagle*, 922 F.2d 404, 406 (7th Cir.1991).

At the evidentiary hearing, Officer Gonzalez testified about the illegal traffic maneuver that lead to stopping Fryer's car on January 29. Although Fryer's counsel both vigorously and ably cross-examined Gonzalez about the events of that traffic stop, he offered no evidence to suggest that the officers stopped Fryer's car for any reason other than a traffic violation. Because the officer's testimony remained uncontradicted, the district court found that the stop was legal.

On appeal, Fryer argues that Officer Gonzalez's testimony changed over time, that his testimony at Fryer's federal and state trials is not consistent with his testimony at the suppression hearing. He claims that the differences in Gonzalez's later testimony underscore the pretextual nature of the stop, somehow tainting the suppression proceedings. We disagree.

First, the differences in Gonzalez's testimony are not as significant as Fryer suggests. At Fryer's trial, Gonzalez testified that from a distance of about half a block he observed a vehicle make a right turn on a red without stopping first at the light. After turning on his Mars lights, the vehicle took from between one and a half to two blocks to pull over, during which time Gonzalez saw both the driver and the passenger moving as if passing something between them. When he searched the vehicle, the glove box was closed, but unlocked. (At Fryer's state trial, Gonzalez testified that the glove box was open, that is, unlocked.) On cross-examination, Gonzalez testified that on his handwritten arrest report he wrote the reason for the stop was the vehicle made a right turn on a red light at an intersection where that maneuver is prohibited. On redirect, he testified that his typewritten report shows the traffic violation was for a right turn on a red light without first stopping. In view of the number of times Gonzalez was called to testify in the various proceedings against Fryer over a five- to six-month period, his testimony is not suspiciously inconsistent.

Second, each time Gonzalez testified he was subjected to thorough, thoughtful cross-examination. At the trial, Fryer's counsel spent considerable time going over each perceived inconsistency with Gonzalez for the benefit of the jury.

Finally, and most importantly, a district judge makes a probable cause determination based on the facts adduced at the suppression hearing. Fryer asks us to reverse the district court here based on testimony adduced later. We will not. Our review of a district court's suppression ruling is based solely on what the district court knew at the time of that ruling. After having reviewed the transcript we are convinced that no mistake occurred. The officers' stop was a legal traffic stop.

■ So the next question is whether the officers had probable cause to search the vehicle. Whenever the circumstances of an on-the-street encounter are such that a police officer reasonably believes he may be dealing with someone who is armed and dangerous, the officer is justified in conducting a pat-down search of that individual for weapons for his own protection, and for that of others nearby. *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968). When the encounter is between a patrol officer and a motorist, and the officer entertains the same reasonable belief he is dealing with a dangerous person, the officer may search those areas within the passenger compartment over which the motorist may gain immediate control and that may conceal a weapon. *Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3480, 77 L.Ed.2d 1201 (1983). In either case, the officer must possess specific, articulable facts which, in combination with inferences to be drawn from those facts, reasonably warrant the intrusion. *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880; *Long,* 463 U.S. at 1049, 103 S.Ct. at 3481.

The district court determined that Officer Gonzalez's suspicions met the *Terry/Long* standard for conducting a search of Fryer's automobile. We see nothing in the record to suggest otherwise. The uncontroverted facts show that while patrol-ling a marginally safe neighborhood, in the wee hours of the morning, a veteran police officer observed a traffic violation. After signalling the car to pull over, the officer observed furtive movements between the driver and the passenger, as if they were passing something between them. The circumstances caused him to caution his less experienced partner, and to conduct searches of both the passenger area of the car and its occupants. These are clearly the kind of specific, articulable facts that the standard contemplates and which warrant a search. There was no error.

## II.

■ Fryer also challenges the district court's ruling on his motion to suppress the evidence obtained during a search of his residence and the automobile parked nearby. Although the FBI agents obtained Mrs. Fryer's signature on two consent forms, one to search the apartment and the other the car, Fryer claims they obtained that consent as a result of subtle coercion and his wife's inability to comprehend their import because of a learning disability. As above, our review is for clear error. *Spears,* 965 F.2d at 269.

So we turn to the evidence before the district court. FBI Agents Conditt and Joseph Doorley testified that while they watched Fryer's apartment, Mrs. Fryer walked out of the building. The agents approached her and identified themselves. They displayed their credentials only, not their weapons. They told Mrs. Fryer that they were investigating her husband in connection with a bank robbery and would like her permission to search their apartment and car. The agents described Mrs. Fryer as surprised, nervous, and frightened. Because of the freezing temperature, the agents asked to continue their conversation with her in their car. She agreed.

In the warmth of the car, the agents explained their purpose a second time. Mrs. Fryer asked if she had to let them conduct their searches, and Agent Doorley responded she did not. They then read to her the consent to search form. Mrs.

Fryer took a moment to think, then asked if she could make a telephone call. When they said of course, she left the car to use the telephone in the building lobby. Doorley accompanied her. Mrs. Fryer spoke on the phone for between three and five minutes, then handed the phone to Doorley, who identified himself to the female voice on the other end. The voice told Doorley she saw no reason not to conduct a search.

After the phone call, Mrs. Fryer agreed to sign the consent form. Doorley then motioned for the other agents to join them, after which Mrs. Fryer told them she could read and write. The agents saw Mrs. Fryer read the form, and then Doorley read it aloud to her. Mrs. Fryer signed the form and opened the apartment door for the agents. On entering they were met by Mrs. Fryer's sister, Rotanda Perry. Perry asked the agents, in Mrs. Fryer's presence, if they had a search warrant. They informed her Mrs. Fryer gave consent. When she began to argue with Mrs. Fryer, Doorley asked to speak with her in another room. She assented. Doorley showed Perry his credentials and a copy of a photograph from one of the bank surveillance tapes. Perry then calmed down and the agents began the search.

In the meantime, Conditt prepared a consent to search form for the automobile parked outside. He handed it to Mrs. Fryer, explaining its import. She said that because of the poor lighting in the living room she was unable to read the form. She moved to the dining room, read the form, and signed it. When agents finished searching the apartment, Mrs. Fryer accompanied them outside to the car and opened it for them with her key. By the time the agents completed their searches they had been with Mrs. Fryer for approximately an hour and a half. Based on their observations during that time, Conditt and Doorley both believed that she understood what they said to her and the actions they took.

In stark contrast, Mrs. Fryer, a twenty year-old with a tenth grade education, testified on direct examination that because of a learning disability she could not read the consent form when it was presented to her and no one informed her she could withhold consent. Indeed, they told her it would be better if she cooperated or she might be implicated in the robberies, and they would get a search warrant anyway. Further, agents began their search of the apartment before she signed the form. On cross-examination, Mrs. Fryer acknowledged that the agents had not threatened her in any way, in fact, several of them were perfect gentlemen. She then admitted that one of the agents read a consent form to her, and she had to think about it before giving consent for the apartment search. She did not agree immediately, telephoning her mother first.

Considering the totality of the circumstances, the district judge held that Mrs. Fryer's consent had been given voluntarily. In reaching that conclusion, the judge considered that she was strongly motivated to help her husband. To accept her version, the judge noted, would require him to accept that several trained FBI agents would intentionally jeopardize an investigation and deliberately lie about it. After he viewed both the agents and Mrs. Fryer, and considered her effort to assist her husband, he credited the agents' testimony. There is nothing about that determination that leads us to conclude a mistake has occurred.

### III.

The final motion before the district court at that hearing was Fryer's motion to suppress the lineup identifications. Because the photograph of the lineup participants showed that Fryer was one of only two light-skinned black men, the court found that the lineup posed a serious problem of suggestibility. As a result, it set the motion over for an evidentiary hearing to determine whether the reliability of the bank robbery witnesses' identifications of Fryer overcame any suggestiveness of the lineup. At the conclusion of that hearing, at which all witnesses except James testified, the district court held that the standard of reliability had been met and denied Fryer's motion to suppress. Fryer argues

to us that because the identifications were the result of suggestiveness, the district court erred.

In *Rodriguez v. Young*, 906 F.2d 1153, 1161 (7th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 698, 112 L.Ed.2d 688 (1991), following *Manson v. Braithwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), we established a two-step procedure for challenges to identification testimony: first, a defendant must make a showing of suggestibility, which if present, can be overcome by a showing of reliability, the second step. When the judge held the motion over for a further hearing, he did so because of his concern over the suggestibility of the lineup. At the commencement of that hearing, he stated that "I have in the first instance made the determination that the first branch of the inquiry is one that I had resolved against the government. We are looking only at the second branch." Transcript of Proceedings (Tr.) at 314. Because we have viewed the photograph of the lineup array and appreciate the judge's concern, we will not disturb that determination. Thus, as did the district judge, we will focus on the reliability element of a *Rodriguez* inquiry: "whether the suggestion connected with the earlier identification was so corrupting as to lead to 'a very substantial likelihood of irreparable misidentification.'" *Rodriguez*, 906 F.2d at 1162 (quoting *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)).

"Reliability," the Court wrote in *Manson*, "is the linchpin in determining the admissibility of identification testimony." 432 U.S. at 114, 97 S.Ct. at 2253. *Biggers* provides us with five factors to consider when assessing witness reliability and the possibility of misidentification: (1) the opportunity of the witness to view the event and the actor; (2) the degree of the witness's attention; (3) the accuracy of the witness's description; (4) the witness's level of certainty; and finally, (5) the time elapsed between the crime and the identification. 409 U.S. at 199–200, 93 S.Ct. at 382. We will take each factor in turn.

Each witness [1] had an unobstructed view of the robber from a distance of no more than five feet, and at least one, Ruhnke, as close as one to one and a half feet. Each stated he or she got a clear look at the robber's face. In fact, Vasavada moved to the side of Wilson to get a better look at him. All except for Tsipas testified to making eye contact with him.

All of the witnesses had a general awareness of the people standing in the customer waiting line, and demonstrated a heightened level of attention while being robbed or witnessing a co-worker being robbed. Something about the robber's mannerisms struck Reardon as strange, "creepy." Wilson, by deliberately looking at him, tried to convey to him that he was frightening her by his movements.

The accuracy of the witnesses' descriptions is borne out by their remarkable consistency with the evidence. All but Barreto described the robber as a fair-skinned black man.[2] He is. Barreto described him as wearing a moustache; Reardon described his hair as short and "messed up," looking as if it had been chemically treated; several witnesses described the robber's high cheekbones. Fryer displays all of these features in the photo taken after the lineup, Government's Exhibit "Polaroid Photo." Tsipas, Wilson, Reardon, Barreto, and Ruhnke all described him as wearing a brown leather jacket; Wilson and Ruhnke

**1.** Because of our detailed recitation of the witnesses' identifications of the robber at the outset of this opinion, we will not recount them again. *See supra* pp. 814–17. That recitation is consistent with the testimony of the six eyewitnesses (Tsipas, Wilson, Vasavada, Barreto, Reardon, and Ruhnke) who testified at the suppression hearing. As necessary, additional facts will be discussed.

**2.** Fryer asserts that while in the waiting room with the other witnesses before the lineup, Bar-

reto changed his description of the robber from a white man to a fair-skinned black man because of discussion among the witnesses, and for that reason it was unreliable. When he ruled that Barreto's testimony was admissible, the district court added that whatever inconsistency Barreto demonstrated went to the weight of his testimony, not its admissibility. The district court was correct. At trial, Fryer's counsel skillfully cross-examined Barreto about his earlier description of the robber as a white man.

said it had colored patches on it. A photograph of a brown, bomber style jacket with multicolored patches was admitted as Government's Exhibit 8. Reardon and Ruhnke said he was wearing a scarf along with the jacket. Agents recovered a scarf matching their descriptions from Fryer's car. And finally, Ruhnke, one of the Pathway witnesses, said the robber had a red, puffy cut under his right eye. The photograph recovered from Fryer's home, Government's Exhibit "Apartment Photo," taken four days before the Pathway robbery, clearly shows an angry cut under Fryer's right eye, accompanied by severe swelling on both sides of his nose. The photograph made from the Pathway videotape, Government's Exhibit "Pathway Stills," shows a shadow under the robber's right eye in the area where the cut appears on the January 4th photograph of Fryer. Although that may be the result of the poor quality of the video photograph, the clearly visible swelling on both sides of the robber's nose is not. And that same shadow and swelling appear on the photograph taken of Fryer after the lineup, Government's Exhibit "Polaroid Photo."

The witnesses' level of certainty at the confrontation, as the district court stated, "in every instance was extraordinarily striking." Tr. 339. Indeed. Vasavada, Barreto, Ruhnke, and Reardon recognized Fryer as the robber immediately on seeing him.[3] Tsipas "figured" it was Fryer as soon as she saw him, but waited to make the identification until all the lineup participants were in the room. Wilson also identified Fryer while viewing the lineup.

The final factor we consider is the time elapsed between the crime and the identification. The first robbery, Edgewater, took place on November 16, the last, Pathway, on January 8. The witnesses viewed the lineup on January 29. For the Edgewater witnesses, that was a matter of about two and a half months; for the Citicorp witness it was about two months; and, for the Pathway witnesses, it was three weeks. The length of time between when any of these people witnessed the crime and later identified the robber is not so long as to cast doubt on their reliability.

Having considered all of the *Biggers* factors, we conclude that the reliability of the witnesses' identifications overcame any suggestiveness in their initial confrontations with the defendant. For that reason, the district court did not err in admitting their testimony.

## IV.

■ Among Fryer's remaining challenges to his conviction and sentence, only one raises an issue that merits discussion. Count seven of the indictment charges Fryer with being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g). One of the elements necessary to prove that charge, of course, is evidence that Fryer was indeed a convicted felon. Over the defendant's objection, after giving the jury a cautionary instruction, the court allowed the government to introduce evidence that Fryer's prior conviction was for robbery.[4] Although the jury ac-

3. In addition to arguing the lineup was suggestive, Fryer also argues the agents' use of single photographic displays with several of the witnesses also was impermissibly suggestive. Recall that immediately after the Edgewater robbery, Vasavada and Wilson saw the video of the robbery. Wilson, immediately when she saw Fryer, said "there he is." Tsipas was shown a photograph made from that video. Barreto also viewed the video of the robbery at Citicorp immediately after it occurred. These people, therefore, were shown photo- or video-graphic representations of events they witnessed firsthand. Reardon and Ruhnke, only, were shown photographs made from the videotape of another robbery, not the one they witnessed. The issue of suggestibility, however, already has been resolved in Fryer's favor. As we discuss herein, the reliability of the witnesses identifications overcomes any suggestibility.

4. After the judge instructed the jury they should consider the conviction for a limited purpose and the government read a certified copy of Fryer's conviction to the jury, defense counsel requested a sidebar. During that conference, Fryer's counsel informed the court that the certified copy contained an error in the sentence Fryer received for the conviction. The judge then instructed the jury that what they just heard might have been in error, and counsel would check on it. In the meantime, he instructed the jury to disregard the nature of the prior conviction. After the government obtained a new certified copy of conviction, de-

quitted Fryer on count seven, he argues that allowing the jurors to learn the nature of his prior conviction prejudiced him in their consideration of the robbery counts of which they convicted him.

 A district court is vested with wide discretion in ruling on the admissibility of evidence, and we reverse only for abuse of that discretion. *United States v. Allen*, 798 F.2d 985, 1001 (7th Cir.1986). In *Allen*, the defendant raised a comparable argument. There, one count of a five-count indictment charged Allen with transportation of explosives by a convicted felon in violation of 18 U.S.C. §§ 842(i) and 844(a). Allen argued that the sole purpose for that count was to prejudice the jury as to the remaining counts by introducing evidence of his conviction. Employing a balancing test under Rule 403 of the Federal Rules of Evidence,[5] we held that the probative value of Allen's felony record was substantial because it was an element of the offense. *Id.* at 1001.

The same is true here. Evidence of Fryer's earlier conviction was an essential element of the crime charged in count seven. As to the remaining counts, Fryer's assertion to the contrary notwithstanding, any prejudice to him was insubstantial, if not nonexistent, in the face of the overwhelming evidence of his guilt: the eyewitness identifications, the videotapes of the robberies, the gun, the jacket, the scarf, and the photo of his battered face. Moreover, the district court correctly preceded the introduction of his conviction with a cautionary instruction to the jury. We hold that it did not abuse its discretion in allowing the government to read to the jury Fryer's prior conviction.

fense counsel informed the court that although it stated the correct sentence, this copy contained the wrong charge. To expedite matters, defense counsel agreed to handle introduction of the prior conviction by way of stipulation, expressly stating that he was not waiving his objection to the inclusion of the nature of the offense in the charge. The prosecutor then read the stipulation about the prior conviction to the jury, which included that Fryer was charged with armed robbery in that case, but convicted only of robbery.

V.

Because Fryer's remaining arguments are meritless, we reject them. For the foregoing reasons, Fryer's conviction and sentence are

AFFIRMED.

5. The Rule provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

FED.R.EVID. 403.