UNITED STATES of America, Plaintiff–Appellee,

v.

Gregory L. PRICE, Defendant–Appellant.

No. 98–3972.

United States Court of Appeals, Seventh Circuit.

Argued April 7, 1999.

Decided July 6, 1999.

Stephen A. Ingraham (argued), Thomas P. Schneider, Office of the United States Attorney, Milwaukee, WI, for plaintiff-appellee.

Allan D. Krezminski (argued), Milwaukee, WI, defendant-appellant.

Before FLAUM, RIPPLE and ROVNER, Circuit Judges.

FLAUM, Circuit Judge.

Gregory Price appeals from his conviction for possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1) on the

grounds that the district court erroneously denied his motion to suppress. For the reasons stated herein, we affirm.

## I. BACKGROUND

On November 13, 1997, at approximately 10:00 p.m., the Milwaukee Police Department received an anonymous tip stating that a white Mercury Cougar, with a license plate containing the letters "FLJ," would be delivering one kilogram of cocaine to a woman named Rosie Hudson at a residence located at 5313 West Center Street in Milwaukee. The tipster, claiming to be from Sheboygan, Wisconsin, told the police that the car had left Sheboygan at about 9:00 p.m. Sheboygan is approximately sixty miles from downtown Milwaukee. The tipster also stated that the car would contain two African–American women, Charlene Oldenberg (who would be driving) and Patricia Trotter, and one African–American man named Calvin.

Detective Teske and Officer Kolatski of the Milwaukee Police Department arrived at the vicinity of 53rd and Center Streets in an unmarked car at around 10:45 p.m. to stake out 5313 West Center Street. The officers did not verify whether a Rosie Hudson lived at the residence, nor did they perform record checks of the three individuals named by the tipster.

At approximately 11:20 p.m., a white Mercury Cougar arrived containing two African–American women and two African–American men. At this point, the defendant's version of events differs from that of the officers. According to Detective Teske, the driver was an "elderly black woman," who double-parked the car and left the engine running. He testified that the car's license plate contained the letters "GJL," and that all four occupants got out and approached the residence at 5313 West Center Street. Teske stated that he stopped them at the sidewalk, identified himself and indicated that he was investigating a narcotics complaint. The detective said he was armed but did not draw his weapon.

Detective Teske further related that he asked the "elderly black female" for identification and she gave him a driver's license identifying her as Charlene Oldenberg and that the following events occurred. She consented to a search of her purse in which Teske found a bag of white residue which he believed to be cocaine. Teske thought the quantity was indicative of personal use rather than distribution. He found no weapons in her purse. Teske testified that he then asked one of the two men, defendant Gregory Price, if he could search him. Teske felt a hard object during a pat-down of Price's three-quarter length leather coat, which the detective discovered to be a gun by lifting Price's coat. While Teske was searching the individuals, Officer Kolatski looked inside the car and did not observe any contraband. After Price had been searched and handcuffed, Kolatski searched the car but did not find anything.

Price recalls the events differently. He testified that he stayed by the car as Oldenberg approached the residence and that Officer Kolatski told him to go join the others on the sidewalk. Price denied that he was asked his consent for the search or that he was wearing a coat. He also claims that Detective Teske only said he was investigating a complaint, but never specifically referred to drugs.

After he was indicted on a charge of felon in possession of a weapon, Price moved to suppress the firearm seized from him on the grounds that the police lacked the requisite reasonable suspicion to search him. Following an evidentiary hearing, the magistrate judge recommended that the motion to suppress be granted. The district court rejected the recommendation and denied the motion. Price then pled guilty, but reserved the right to appeal the suppression decision.

## II. DISCUSSION

Price argues that the district court erred in denying his motion to sup-

press because it incorrectly determined that the police had specific and articulable facts to reasonably suspect that he was either engaged in wrongdoing or was armed and dangerous. The district court's determination as to whether the defendant was subjected to a lawful investigative stop is a question of law reviewed de novo, *Ornelas v. United States*, 517 U.S. 690, 697, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *United States v. Tirrell*, 120 F.3d 670, 674 (7th Cir.1997), while findings of historical fact are reviewed for clear error, *Ornelas*, 517, U.S. at 699. Additionally, in the context of a motion to suppress, we give special deference to the district court's rulings due to the fact-specific nature of the proceeding. *United States v. Griffin*, 150 F.3d 778, 783 (7th Cir.1998) (citing *United States v. Stribling*, 94 F.3d 321, 323 (7th Cir.1996)).

■■ Under *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a police officer can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity is afoot. Reasonable suspicion has been defined as "some objective manifestation that the person stopped" is involved in criminal activity. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). We have held that "in determining whether a particular police-citizen encounter was supported by reasonable suspicion, courts must consider the totality of circumstances known to the officer at the time of the stop." *United States v. Quinn*, 83 F.3d 917, 921 (7th Cir.1996) (citing *Cortez*, 449 U.S. at 417–18, 101 S.Ct. 690). Moreover, "in evaluating the reasonableness of an investigative stop, we examine first whether the officers' action was justified at its inception and, second, whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Smith*, 3 F.3d 1088, 1095 (7th Cir.1993) (quoting *United States v. Glenna*, 878 F.2d 967, 971 (7th Cir.1989)).

The defendant argues that the officers lacked reasonable suspicion to search him because the anonymous tip did not include any information that related directly or indirectly to him, such as his name or physical description and that the government has failed to provide any specific and articulable facts which provided a reasonable suspicion that Price had committed or was about to commit a crime. Price also takes issue with the reliability of the information in the tip and argues that the fact that Detective Teske did not draw his weapon is evidence that he never thought Price was armed or dangerous.

■ We find Price's arguments unpersuasive and conclude, as did the district court, that, based on the totality of the circumstances and the unique facts of this case, the police officers had a sufficient reasonable suspicion to stop Price. To determine whether an anonymous tip has furnished police with enough verifiable information to provide reasonable suspicion, courts examine the amount of information given, the degree of reliability, and the amount of police corroboration. *United States v. Navarro*, 90 F.3d 1245, 1253 (7th Cir.1996). Additionally, we are guided by the Supreme Court's conclusion that if "an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity." *Alabama v. White*, 496 U.S. 325, 331, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Here, the information provided by the tipster was right about almost everything and the police were able to corroborate the tip by confirming: (1) the color of the car; (2) the make of the car; (3) that the Wisconsin plate had two of the three letters alleged; (4) the address of the destination; (5) an arrival time consistent with travel from Sheboygan; (6) that there were two African–American females and at least one African–American male in the car; and, (7) before they patted down Price, the name of one of the car's occupants, Charlene

Oldenberg. Additionally, by the time Price was searched, Detective Teske found what looked like cocaine in Oldenberg's purse, further corroborating that the people in the car were involved in drug activity.

■ It is significant that many of the details corroborated by the police before they stopped the defendant—such as the exact destination of the car, the time of arrival, the existence of drugs—related to "future actions," and were "details that only someone personally acquainted with the suspect would know." *United States v. DeBerry,* 76 F.3d 884, 886 (7th Cir. 1996). This corroborated information could assure the police that the anonymous tipster was not merely "a prankster who seeing a perfectly innocent person in the street calls up the police and describes the location and appearance of the person." *DeBerry,* 76 F.3d at 886.[1] Moreover, the shortcomings in the tipster's description—that one of the letters was wrong and that there were two African–American men in the car rather than one—are not fatal here given all the information that the tipster got right. An informant does not have to be one hundred percent correct to provide the police with reasonable suspicion. *United States v. McClinton,* 135 F.3d 1178, 1183 (7th Cir.1998).

■ To bolster his argument that the police lacked reasonable suspicion to search him, Price claims that since the tip stated that a kilogram of cocaine would be in the car, the officers should have searched the car before searching the individuals. However, we agree with the government that, in the context of this case, it was appropriate to search the individuals before searching the car for two reasons. First, because the tip did not indicate the exact location of the cocaine in the car, the police concluded that one of the individuals might have been carrying the cocaine on his or her body. This was a reasonable conclusion since the stated amount, one kilo, could easily be hidden under a person's clothing. Second, and more compelling, the officers could reasonably have been concerned that the individuals were armed. *See United States v. Ocampo,* 890 F.2d 1363, 1371 (7th Cir.1989) (noting the long-established relationship of firearms to drug trafficking). In fact, Officer Teske testified that he was concerned that one or more of the persons he was investigating would be carrying weapons. This type of limited search for weapons, performed by a suspicious police officer, is the original justification for the *Terry* stop. *Terry,* 392 U.S. at 22–24, 88 S.Ct. 1868.[2]

■ Price also argues that even if the police had reasonable suspicion to search the car, they lacked sufficient suspicion to search him personally. He relies on two cases, *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), and *United States v. Juan Benet Johnson,* 170 F.3d 708 (7th Cir.1999), for the proposition that a *Terry* stop must be based on a reasonable belief that an individual is armed and dangerous and not merely on the fact that the person is on the premises where an authorized narcotics search is taking place. While this proposition is true, neither case he cites compels the conclusion that the

---

1. Price also argues that the tip could not have provided reasonable suspicion to support a *Terry* stop because it was motivated by spite. However, the motive of the tipster is not determinative; what is important is the reliability of the tip, particularly regarding further actions that only an insider would know. *See DeBerry,* 76 F.3d at 886 ("There is still a chance that the tip is a lie—the tipster may be a personal enemy of the person he is reporting—but the probability is sufficiently low to permit the police to stop the person reported on the basis of the tip").

2. Price argues that the fact that Detective Teske did not draw his gun as he approached the occupants of the car demonstrates that the officer did not suspect they were armed because it shows that he did not fear for his safety. We do not find any meaningful significance from Teske's decision not to draw his weapon. If anything, it may be that the detective exercised prudence in not drawing his weapon.

police lacked reasonable individualized suspicion to search Price here. For instance, in *Ybarra*, the police obtained a warrant to search a tavern for narcotics that the bartender allegedly possessed and distributed. The officers frisked each of the tavern's customers, and they found heroin on one of them, Ybarra. The Supreme Court held that the search of Ybarra was illegal because the police lacked probable cause to initially search Ybarra. The Court also rejected the government's alternative argument that the initial search of Ybarra was a *Terry* pat-down for weapons. According to the Court, Ybarra's presence in the bar when the officers searched it did not justify a *Terry* frisk because the police did not have a reasonable belief that Ybarra was at the time armed and dangerous and the police had no reason to suspect that anyone other than the bartender was engaged in criminal activity. The court found Ybarra's "mere propinquity to others independently suspected of criminal activity ... without more" insufficient to create individualized reasonable suspicion to search him. *Id.* at 1240.

*Johnson* is similarly distinguishable. In that case, this court held that police officers lacked reasonable suspicion to stop the defendant when he emerged from an apartment as the officers were about to knock pursuant to a "knock and talk" technique. (According to this procedure, the police approach a residence where they suspect drug dealing is occurring, they listen outside the door for a brief period of time, and then they knock on the door and attempt to persuade whoever answers to give them permission to enter. *Johnson*, 170 F.3d at 711.) We stated in *Johnson* that "nothing in subsequent decisions of the Supreme Court has repudiated the requirement for individualized suspicion for either a *Terry* stop or a full-blown search in the circumstances provided here." *Id.* at 716. However, we cautioned that "we hold only that before a police officer targets a particular house and decides to seize literally anyone who might emerge from that house, he or she must either

have a warrant or fall within one of the warrant exceptions that the Supreme Court has recognized." *Id.* at 710.

Unlike in *Ybarra* and *Johnson*, here there was sufficient suspicion to search Price. First, by the time the police corroborated much of the tip, the occupants of the car, including Price, were suspected of transporting drugs. Thus, it was more than Price's "mere propinquity to others independently suspected of criminal activity" that gave rise to this search. *Ybarra*, 444 U.S. at 86, 100 S.Ct. 338. Second, as stated above, Detective Teske indicated that he thought Price might be armed, a reasonable belief given the well-established relationship between drug trafficking and guns. *Ocampo*, 890 F.2d at 1371. Third, and more specifically, the officers could have considered that "drug dealers are often accompanied by armed guards, [making] it ... reasonable ... to ensure that [the defendant] had no weapons." *United States v. Rivers*, 121 F.3d 1043, 1045 (7th Cir.1997). This was not a sweeping search of everyone who happened to be on the premises—this was a search of one of four individuals who exited a car that was suspected of transporting cocaine. Therefore, we are satisfied that, in the context of this case, the police officers had sufficient reasonable suspicion to search Price.

## III. CONCLUSION

For the reasons stated herein, we AFFIRM the judgment of the district court denying Price's motion to suppress.