**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 19, 2005
Decided February 15, 2006

**Before**

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. ILANA DIAMOND ROVNER, *Circuit Judge*

Hon. DIANE P. WOOD, *Circuit Judge*

No. 03-4035

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    *Plaintiff-Appellee,* | Appeal from the United States District<br>Court for the Central District of Illinois |
| *v.* | No. 03-CR-10004 |
| DERRICK T. COOKS,<br>    *Defendant-Appellant.* | Michael M. Mihm,<br>*Judge.* |

**ORDER**

   Police officers in Macomb, Illinois, found crack cocaine and a handgun after stopping Derrick Cooks for speeding. A jury found him guilty of drug and gun charges after the district court denied his motion to suppress. In this appeal, Cooks challenges the suppression ruling. We uphold that decision and affirm Cooks's convictions.

   At 11:11 p.m. on January 1, 2003, Macomb police officer Anthony Fillingham stopped Derrick Cooks for speeding. Eleven minutes later, at 11:22 p.m., a drug-detection dog alerted to the closed trunk of Cooks's car. Fillingham and the dog handler, Officer Kenneth Neaver, searched the car. Although they saw nothing illegal in the trunk, they found a loaded gun in the passenger compartment. Cooks was arrested; a later search of his clothing yielded 36.8 grams of crack. He was

charged with possession of crack with intent to distribute, 21 U.S.C. § 841(a)(1), and carrying a firearm during and in relation to a drug trafficking crime, 18 U.S.C. § 924(c).

Cooks moved on Fourth Amendment grounds to suppress the gun, the crack, and his statements to the officers. In his written motion, he conceded that the stop was valid at its inception, but he alleged that Officer Fillingham stalled in writing a speeding ticket in order to give Officer Neaver and his dog time to arrive and walk around the car. Cooks also alleged in his motion that Neaver coached the dog into alerting. At the suppression hearing, however, Cooks pressed the additional argument that the drug dog's accuracy rate was too low to give the officers probable cause to search his car. The two police officers were the only witnesses at the suppression hearing. The government also introduced a video (and partial audio) recording captured by a dashboard camera in Fillingham's patrol car.

During the hearing Officer Fillingham testified that he stopped Cooks for driving ten miles per hour over the speed limit. At 11:12 p.m. he approached Cooks's car to request his driver's license and proof of insurance. Cooks, who remained seated in his car, told Fillingham that his driving record was clean. At 11:14 p.m., Fillingham returned to his squad car and ran a computer check on Cooks's driver's license. He promptly received a response showing that, in fact, Cooks had a prior speeding ticket. At that point, the officer said, he contacted the dispatcher and requested a criminal history check on Cooks. Within 30 seconds he was notified that Cooks had multiple arrests for drug and weapons offenses.

Officer Fillingham then started writing a speeding ticket. According to his testimony, however, at approximately 11:15 p.m. Cooks began "making motions" toward the passenger side of the vehicle and even disappeared from view as "he ducked his head and shoulders down." These movements continued for a period of time, Fillingham said, leading him to suspect that Cooks might be accessing or hiding a weapon or drugs. The video taken from Fillingham's car confirms the officer's testimony. At 11:17 p.m., Fillingham exited his squad car to investigate. He explained that he briefly circled Cooks's car but returned to his own car to finish writing the ticket because Cooks had ceased his "suspicious" movements. At this point, it was 11:18 p.m., only seven minutes after Fillingham pulled Cooks over.

Fillingham was still writing the ticket, he said, when Officer Neaver arrived with his dog, Hondo. Fillingham insisted that he never asked for backup, but once Neaver arrived, Fillingham asked him to walk Hondo around Cooks's car. Fillingham's video shows that Neaver started the walk-around at the trunk and allowed Hondo to sniff around the car. After one full lap, Neaver pointed and tapped on the trunk, and Hondo alerted by pawing at it. The alert came at

11:22 p.m., approximately 30 seconds after Neaver started the walk-around and less than 11 minutes after Fillingham first approached Cooks's car.

Once Hondo alerted, Officer Fillingham returned to Cooks's car, asked him to step out, and handed him the ticket he just finished writing. Fillingham then conducted a pat-down with Cooks's permission, but found nothing. He further testified that at that point he began searching the interior of Cooks's car while Cooks and Officer Neaver stood by. Neaver, though, suddenly yelled, "Gun!" and started to handcuff Cooks. Fillingham went to his aid and, after learning that the loaded gun was inside the car, retrieved it from the center console. According to Fillingham, further searching uncovered an open bottle of cognac beneath the driver's seat and two marijuana seeds on the passenger side of the car. However, no contraband was found in the trunk where the dog alerted. Cooks was transported to the lockup, where an officer, while searching Cooks's clothing, found a clear plastic bag containing the crack.

Officer Neaver corroborated Fillingham's account. Neaver confirmed that no one dispatched him to assist Fillingham. Instead, he said, he heard the results of Cooks's criminal background check over the radio and independently decided that Fillingham might need a dog handler. Neaver testified that he and Hondo trained together and were first certified in narcotics detection in 2000. They were re-certified the following year and completed a 16-hour refresher course in 2002. However, Neaver did not challenge defense counsel's representation that a log Neaver kept to document Hondo' performance showed that drugs had been found in just 43% of the instances where the dog alerted. Neaver did explain, however, that he tapped and pointed at the trunk because handlers routinely use this method to keep their dog interested in sniffing areas within reach of its nose.

Neaver also told the court that, as Officer Fillingham began searching the passenger compartment, Cooks volunteered that he and his girlfriend often smoked marijuana while driving and that he had just smoked marijuana in the car the previous day. It was then, Neaver said, that Cooks also volunteered that he had a gun in his car. That statement is what prompted him to shout a warning to Fillingham about the gun.

At the conclusion of the suppression hearing, the district court denied Cooks's motion from the bench. The judge, who watched the video tape of the stop, emphasized that any delay in processing the speeding ticket resulted from Officer Fillingham's need to investigate Cooks's "substantial" and "truly unusual" movements to ensure his own safety. The court further concluded that Fillingham did not stall in writing the ticket in order to allow time for Officer Neaver to arrive with Hondo, and that the officers completed the ticket and the dog sniff within a "reasonable time period." With regard to the dog sniff itself, the court

acknowledged that what seemed to be a low accuracy rate in the dog's previous alerts presented an "interesting situation," and suggested that at some level a low accuracy rate might undermine reliance on a dog's alert as the basis for finding probable cause to search. The court also recognized, however, that dogs will alert to drug residue even where the drugs themselves are no longer present. The court observed that a more useful inquiry is whether the dog was properly certified. Nothing in the record indicates that Hondo did not have proper certification. In addition, the court explicitly found that Neaver's tapping did not coax Hondo to alert, but merely focused the dog's attention on his task. The court added, moreover, that Hondo's alert really did not matter because Cooks's suspicious movements were enough to give Officer Fillingham a basis for searching the passenger compartment.

On appeal Cooks contends that, by the time the dog alerted to his car, he already had been detained for an unreasonable period of time. He also argues that the scope of the stop should have been limited to ticketing him for speeding, and that, regardless, Hondo's positive alert did not constitute probable cause to search because the dog is too often wrong. When reviewing a suppression ruling, we review questions of law *de novo* and findings of fact for clear error. *See United States v. Banks*, 405 F.3d 559, 570 (7th Cir. 2005). We will uphold a district court's factual findings so long as they are plausible in light of the evidence. *United States v. White*, 240 F.3d 656, 660-61 (7th Cir. 2001).

We start with, and readily reject, the contention that Officer Fillingham unreasonably prolonged the traffic stop so that Officer Neaver could walk Hondo around his car. Although Cooks concedes that the stop was "reasonable at its inception," Cooks argues that Fillingham "unreasonably prolonged the length of the stop by his inaction during the time he claimed to be writing the ticket in his squad car." A stop justified solely by the need to investigate a traffic violation "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 125 S. Ct. 834, 837 (2005); *accord United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005). On the other hand, information lawfully obtained while investigating the traffic offense "may provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation." *Martin*, 422 F.3d at 602; *accord United States v. Muriel*, 418 F.3d 720, 726 (7th Cir. 2005).

The problem for Cooks is that his argument directly contradicts the district court's factual finding that Officer Fillingham did not tarry in writing the ticket before or after Officer Neaver arrived. This finding is not clearly erroneous, and Cooks does not even argue otherwise. Fillingham's video supports the court's finding; the clock shows that just over eight minutes elapsed between the time Fillingham began writing the ticket and when the dog alerted. Moreover, there is

no evidence contradicting Fillingham's testimony that he did not call for backup and did not even know that Neaver was en route.

If anything, as the district court found, any delay in writing the ticket was entirely Cooks's fault. Although Cooks disputes this finding, it is not clearly erroneous. The video shows him making quick, jerky movements with his head and shoulders and ducking out of sight several times. Given Cooks's movements, the district court correctly found that Fillingham had reason to believe the Cooks was attempting to hide or access drugs or a weapon and, thus, grounds, to pause to investigate. *See United States v. Arnold*, 388 F.3d 237, 239, 240 (7th Cir. 2004) (explaining that motorist's "clambering" into backseat created reasonable suspicion to search passenger compartment for weapons); *United States v. Fryer*, 974 F.2d 813, 819 (7th Cir. 1992) (holding that "furtive movements" between driver and passenger during traffic stop created reasonable suspicion to search passenger compartment for weapons).

We can also quickly dispense with Cook's related contention that the "arrival of the drug-sniffing dog impermissibly expanded the scope of the traffic stop from a stop to issue a citation for speeding into a full-blown drug investigation." As Cooks must know because he cites *Caballes*, no level of suspicion is necessary to conduct a dog sniff during an ongoing traffic stop. *Caballes*, 125 S. Ct. at 838; *United States v. Brock*, 417 F.3d 692, 695 (7th Cir. 2005). Only if the dog sniff is conducted during an *unlawful* detention will contraband discovered as a result be considered the product of an unconstitutional seizure. *Caballes*, 125 S. Ct. at 837; *see People v. Cox*, 782 N.E.2d 275, 281 (Ill. 2002). That was the situation in *Cox*, which Cooks tries to analogize to this case.

The analogy does not work. In *Cox,* an officer pulled the defendant over for a traffic violation, called a dog handler to conduct a sniff, and subsequently discovered marijuana. *Cox*, 782 N.E.2d at 277. The Supreme Court of Illinois held the detention unlawful because the officer stalled in completing the ticket and was unable to articulate any specific reason justifying the defendant's extended detention for the dog sniff; the officer admitted that he did not smell marijuana or notice drug paraphernalia, or deem the defendant's behavior suspicious. *Id.* at 280-81. Here, in contrast, the district court found that Officer Fillingham *did not* delay writing the ticket as a way of prolonging the stop, and, as we have said, the court's finding on this point is not clearly erroneous. In relying on *Cox*, Cooks simply refuses to acknowledge this critical distinction between the facts of the two cases.[1]

---

[1] In connection with this argument, Cooks contends that we should reconsider our *en banc* holding in *United States v. Childs*, 277 F.3d 947 (7th Cir.

(continued...)

That leaves Cooks's final contention about the value of the dog's alert. Cooks contends that, even if the dog sniff was itself permissible under the Fourth Amendment, the dog's positive alert still did not give rise to probable cause because, by his calculation, the dog's accuracy rate was only 43%. (Cooks has abandoned his assertion that Officer Neaver coached the dog to alert.) The government responds that, because drug-detection dogs often alert to drug residue, the only relevant question is whether Hondo was certified.

Although we agree with the district court that there may be problems with the manner in which the defendant evaluated Hondo's reliability, we see no reason to explore the question further in this case. As the district court recognized, Officer Fillingham did not need to rely on Hondo's alert in order to search the passenger compartment for weapons; Cooks's furtive movements before Officer Neaver even arrived were enough to justify that intrusion into the car. Police may order a driver out of his car during a lawful traffic stop without any level of suspicion. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) (*per curiam*); *Muriel*, 418 F.3d at 726. And where police have reasonable suspicion to believe an occupant of the car is hiding or accessing a weapon, they may conduct a protective search of the passenger compartment so long as the search is "limited to those areas in which a weapon may be placed or hidden." *Arnold*, 388 F.3d at 239 (citing *Michigan v. Long*, 463 U.S. 1032, 1049 (1983)). Here, the district court properly concluded that Cooks's "truly unusual," videotaped movements during the traffic stop gave Fillingham ample reason to suspect that he was hiding or accessing a weapon. Cooks suggests that the officer's suspicion could not have been reasonable because he did not take quicker action—he did not draw his gun, call for back-up, or conduct a pat-down as soon as he saw Cooks moving around—but there is no requirement that police officers utilize every available procedure immediately or at all. *See United States v. Price*, 184 F.3d 637, 641 n.2 (7th Cir. 1999) (rejecting defendant's argument that because the officer did not draw his gun, he did not think the suspects were armed).

---

[1](...continued)
2005) (*en banc*), that stops for traffic violations should be evaluated as noncustodial "arrests" rather than investigatory stops made pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). Cooks apparently believes that the stop of his car would be deemed unreasonable if analyzed under *Terry*. The logic eludes us. Cooks was speeding, and even he admits that the stop was permissible under the Fourth Amendment, at least initially. Calling the encounter a "*Terry* stop" instead of an "arrest" changes nothing. The speeding offense was still unresolved when the drug dog alerted, so Cooks would not have been free to leave no matter what label we attach to the traffic stop.

Accordingly, the judgment of the district court is AFFIRMED.