In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-2206

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHERYL NADINE GANSER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 00-CR-40020—**Joe Billy McDade**, *Chief Judge.*

ARGUED NOVEMBER 28, 2001—DECIDED JANUARY 17, 2003

Before HARLINGTON WOOD, JR., KANNE, and ROVNER,
*Circuit Judges.*

HARLINGTON WOOD, JR., *Circuit Judge.* On September
21, 1999, the postal inspection service in Des Moines, Iowa
received a call from the police chief of Woodhull, Illinois.
The chief stated that he had received information from
a confidential informant ("CI") that Steven Simmons of
Colona, Illinois had been receiving methamphetamine
in the U.S. mail.[1] The CI stated that the methamphet-
amine was being sent by a "Cheryl" from Long Grove,

---

[1] The Des Moines postal inspection service's area of responsibil-
ity includes areas of western Illinois including Henry County,
which encompasses the cities at issue in this case.

California and that Simmons had received three or four previous shipments. The CI believed that Simmons would be receiving another shipment around the middle of the next week, that is from approximately September 28 to September 30, 1999, and that the methamphetamine would be shipped in a greeting card. As a result of this information, postal authorities placed a mail watch on Simmons' mail. Under the mail watch, the postmaster in Colona was instructed to contact the Des Moines postal inspection service before delivering any greeting card-type piece of mail addressed to Simmons from a Cheryl in California.

On October 21, 1999, the Colona postmaster received a first class letter in a red, card-type envelope addressed to Steve Simmons. There was a return address label on the envelope which read, "Cheryl Ganser, 1672 Main St. E318, Ramona, CA 92065." The Colona postmaster contacted the Des Moines postal inspection service. Postal inspectors told the Colona postmaster to forward the letter to their office via overnight mail. The letter arrived at the Des Moines postal inspection service the next day at approximately 11:00 a.m. At that time, the letter was presented to a drug detecting police dog for a "free air search." The dog alerted to the envelope, indicating the presence of a narcotic odor. Because the investigators who handled these type of cases were all out of the office on October 22, the letter was secured after the dog sniff for follow-up investigation the next day.

Also on October 22, another first class letter addressed to Simmons from Ganser arrived in Colona. The postmaster alerted the Des Moines postal inspection service and forwarded this second letter to the Des Moines office by overnight mail. On Saturday, October 23, 1999, postal inspector Randy Miskanic returned to the office after attending a training conference in Philadelphia. Miskanic went to a Des Moines post office to pick up the second let-

ter from the mail stream at approximately 10:00 a.m. Miskanic examined both envelopes and concluded that the first letter may have contained methamphetamine because he could feel "a powdery lump" in the middle of the letter. Given its appearance, Miskanic did not believe that the second letter contained methamphetamine.

Miskanic ran a criminal history on Cheryl Ganser which revealed two convictions for controlled substance offenses in the state of California. He also ran Steve Simmons' criminal history which revealed a 1987 arrest for possession of a controlled substance in Illinois. Miskanic telephoned the Woodhull police chief to confirm the details about the CI's tip. Miskanic then asked the chief about the CI's reliability, and the chief stated that he was reliable. Miskanic also contacted the Colona post office to find out what time Simmons' mail was usually delivered. He was told that the normal delivery time was around 1:00 p.m. Miskanic decided that the letters should be delivered to Simmons in a controlled delivery. Miskanic determined that, given the three-and-a-half hours of drive time from Des Moines to Colona, he would not have enough time to put together a controlled delivery on Saturday. Over the weekend, Miskanic drafted an affidavit in support of a search warrant to present to a judge and enlisted the assistance of local law enforcement personnel to conduct the controlled delivery in Colona on Monday.

On Monday, October 25, 1999, Miskanic drove to Henry County, Illinois where he met with local law enforcement officials and an assistant state's attorney. Miskanic conducted a controlled delivery of the two letters to Simmons' mailbox shortly after 1:00 p.m. on Monday. A search warrant was then obtained for Simmons' residence. The warrant was executed that afternoon. Law enforcement officials seized various items of physical evidence, including the first envelope, which had been opened, and its contents—a greeting card and approximately 3.5 grams of

methamphetamine. Simmons agreed to cooperate with authorities and participated in a controlled purchase of methamphetamine from Ganser through the mail. After receiving a money order from Simmons, Ganser sent another letter to Simmons containing approximately one-half ounce of methamphetamine which was seized by postal authorities. Ganser was subsequently arrested at her place of work in Ramona, California.

On August 16, 2000, based on the two letters containing methamphetamine, Ganser was charged in a three-count superseding indictment with conspiracy to distribute and to possess with intent to distribute at least five grams of methamphetamine and at least fifty grams of a substance containing methamphetamine (Count I); distribution and possession with intent to distribute a substance containing methamphetamine (Count II); and distribution and possession with intent to distribute at least five grams of methamphetamine (Count III). On August 31, 2000, Ganser filed a motion to suppress, asking the court to suppress, among other things, the first envelope and its contents and the letter and methamphetamine obtained in the controlled purchase by mail. Ganser argued that postal authorities had no reasonable suspicion to intercept and detain the first letter and, further, that the detention of the letter from October 21 to October 25 was constitutionally unreasonable. After an evidentiary hearing, the district court in a written order filed November 22, 2000 denied Ganser's motion to suppress. Noting that it was a "close question," the district court found that postal authorities had reasonable suspicion to intercept the first letter despite inaccuracies in the CI's tip including the fact that there is no such city as Long Grove, California and the fact that the letter did not arrive until October 21, 1999. The court also rejected Ganser's contention that the delay in delivering the first letter to Simmons was unreasonable.

On January 5, 2001, with the district court's approval, Ganser entered a conditional guilty plea to Count II. In her plea agreement, Ganser reserved the right to appeal the district court's November 22 order denying her motion to suppress. The government agreed to dismiss Counts I and III. Ganser was sentenced on May 4, 2001 to eighty-four months imprisonment followed by three years of supervised release. Ganser filed a timely notice of appeal.

ANALYSIS

Individuals have a Fourth Amendment right to be free from unreasonable searches and seizures of items they place in the mail. *United States v. Evans*, 282 F.3d 451, 454 (7th Cir.), *cert. denied*, 123 S.Ct. 304 (2002) (citing *United States v. Van Leeuwen*, 397 U.S. 249, 251 (1970)). "However, upon reasonable suspicion that the package contains contraband, law enforcement authorities may detain the package for a reasonable length of time while investigating the package." *Id.* (citations omitted). Ganser raises two issues on appeal. First, she contends postal authorities lacked reasonable suspicion to remove the first letter from the mail stream. Ganser further asserts that the amount of time postal authorities detained the first letter while investigating its contents was constitutionally unreasonable.

We turn first to the issue of reasonable suspicion. We review a determination of reasonable suspicion *de novo*. *Evans*, 282 F.3d at 454. "Reasonable suspicion is more than an inchoate and unparticularized suspicion or hunch." *United States v. Ward*, 144 F.3d 1024, 1034 (7th Cir. 1998) (internal quotations and citations omitted). In determining whether reasonable suspicion existed to support the removal of the first letter from the mail stream, we must consider the totality of the circumstances known to authorities at the time of the first letter's detention. *See*

*id.* A tip from an informant can provide a basis for reasonable suspicion. *Adams v. Williams*, 407 U.S. 143, 147 (1972); *see also Alabama v. White*, 496 U.S. 325 (1990). In determining whether a tip has furnished "enough verifiable information to provide reasonable suspicion, courts examine the amount of information given, the degree of reliability, and the amount of police corroboration." *United States v. Price*, 184 F.3d 637, 640 (7th Cir. 1999). "[I]f 'an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity.'" *Id.* (quoting *White*, 496 U.S. at 331). However, "[a]n informant does not have to be one hundred percent correct to provide the police with reasonable suspicion." *Id.* at 641.

In the present case, the CI correctly predicted that Simmons would receive a letter from a "Cheryl" in California in a greeting card-type envelope. These details accurately predicted future behavior, demonstrating inside information and a special familiarity with Simmons' affairs. *See White*, 496 U.S. at 332. The fact that the CI provided an incorrect city for "Cheryl" and an incorrect date of arrival is not fatal, given the information that the CI got right. After the majority of information in the CI's tip was corroborated, it was reasonable for the authorities to conclude that the CI's allegation that the letter contained contraband was true as well. We conclude that under the totality of the circumstances reasonable suspicion existed to support the removal of the first letter from the mail stream.

The next step in our analysis is to determine whether postal authorities detained the first letter for an unreasonably long period while investigating. The first letter was mailed from California on Tuesday, October 19, 1999, arriving in Colona on Thursday, October 21. The controlled delivery was made on Monday, October 25. We have rec-

ognized that, "at some point in time, a detention of mail extends from a stop to a seizure requiring probable cause" rather than mere reasonable suspicion. *Evans*, 282 F.3d at 455. "'Brevity of detention is an important factor in determining whether it may be justified by reasonable suspicion only . . . . [W]e also consider whether the police diligently pursued their investigation.'" *Id.* (quoting *United States v. Dennis*, 115 F.3d 524, 533 (7th Cir. 1997)).

In the present case, the first letter was detained based on reasonable suspicion as discussed above from Thursday until Friday, at which time a narcotics trained canine alerted to it. Once the canine alerted to the letter, reasonable suspicion was elevated to probable cause. *See United States v. Jones*, 275 F.3d 648, 654 (7th Cir. 2001), *cert. denied*, 122 S.Ct. 1941 (2002). We have previously held that a two-day detention of letters in order to subject them to a canine sniff test was brief enough to be sustained by reasonable suspicion. *United States v. Mayomi*, 873 F.2d 1049, 1054 (7th Cir. 1989). Furthermore, postal authorities in the present case acted diligently. Once the dog alerted to the first letter, it was reasonable to continue detaining the letter long enough to allow for inspection of the second letter. When the second letter arrived in Des Moines on Saturday, Miskanic determined that it probably did not contain narcotics. However, it was too late to set up a controlled delivery in Colona for Saturday, and first class mail is not delivered on Sunday. Therefore, Miskanic effectuated a controlled delivery Monday, the earliest possible time. Under the circumstances of this case, the four-day delay in delivering the first letter was not constitutionally unreasonable.

## CONCLUSION

For the reasons set forth above, the district court's order denying Ganser's motion to suppress is AFFIRMED.


A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*