In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-3101

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

NICHOLAS P. MARROCCO AND VINCENT J. FALLON,

*Appellees*,

*and*

FUNDS IN THE AMOUNT OF ONE HUNDRED
THOUSAND ONE HUNDRED AND TWENTY
DOLLARS ($100,120.00),

*Defendant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:03-cv-03644—**Elaine E. Bucklo**, *Judge*.

ARGUED NOVEMBER 5, 2008—DECIDED AUGUST 24, 2009

Before EASTERBROOK, *Chief Judge*, and RIPPLE and
ROVNER, *Circuit Judges*.

RIPPLE, *Circuit Judge*. After discovering that Vincent Fallon had purchased a one-way train ticket in cash a short time before his trip, Amtrak police officer Eric Romano concluded that Mr. Fallon fit the profile of a typical drug courier. Shortly before Mr. Fallon's train was scheduled to depart, Officer Romano and Officer Sterling Terry approached Mr. Fallon in his compartment, where they asked him several questions. After Mr. Fallon admitted that he was carrying $50,000 in a locked briefcase, the officers seized the briefcase, which was found to contain $100,120.00 in cash (the "funds"). The Government subsequently instituted a forfeiture proceeding under 21 U.S.C. § 881(a)(6). During that proceeding, Mr. Fallon and Nicholas Marrocco (collectively the "claimants") filed a motion to suppress the evidence of a dog-sniff test that had indicated that the funds carried the odor of drugs. The district court granted the motion. It later determined that Mr. Marrocco was the lawful owner of the funds and ordered the funds returned to him. The Government subsequently filed this appeal. For the reasons set forth in this opinion, we reverse the decision of the district court and remand this case for further proceedings.

# I

## BACKGROUND

### A.

On December 6, 2002, Officer Romano performed a search of Amtrak's reservation computer to determine whether any of the passengers scheduled to depart Chi-

cago's Union Station on that date had purchased their tickets under suspicious circumstances. He discovered that Mr. Fallon had paid $310.80 in cash for a one-way ticket to Seattle less than 72 hours before his train's scheduled departure. Officer Romano concluded that the details of Mr. Fallon's purchase fit a drug-courier profile. Mr. Fallon arrived at the platform twenty minutes before the train's scheduled departure time. Upon learning of Mr. Fallon's arrival, Officer Romano and Officer Terry approached Mr. Fallon's compartment, identified themselves and showed Mr. Fallon their badges. At the officers' request, Mr. Fallon gave the officers his identification and ticket. He told them that he was traveling to Seattle to visit a girlfriend. The officers asked Mr. Fallon whether he was carrying any drugs, weapons or large sums of money. They noticed that Mr. Fallon was sweating when he replied that he was not carrying any of those items. When the officers inquired about the backpack and briefcase in Mr. Fallon's compartment, Mr. Fallon stated that the bags were his, that he had packed them himself and that no one had given him anything to carry. Mr. Fallon allowed the officers to search the backpack; they found nothing incriminating. Mr. Fallon denied the officers' request to search the briefcase. Officer Romano then took the briefcase from the compartment and asked Mr. Fallon if he had a key to the briefcase. Mr. Fallon said he did not, and he explained that he had used a knife to open it. He then told Officer Romano that the briefcase contained $50,000.

The officers then asked Mr. Romano to accompany them to the Amtrak police office, and Mr. Fallon complied. Officer Romano used a pocket knife to open the briefcase

and discovered that it contained bundles of money. He then quickly shut the briefcase. Officer Terry then called a police dispatcher and requested that a police dog (the "canine unit") be brought to the office to conduct a sniff search of the briefcase. Later, the canine unit arrived at the office and alerted to the briefcase, indicating that it contained drugs or money contaminated with drugs. The currency was removed from the briefcase, sealed into evidence bags and sent to a bank to be counted. The bank determined that the funds amounted to $100,120.00.

**B.**

The officers retained the briefcase and the funds; the Government subsequently filed a complaint, alleging that the funds were subject to forfeiture under the Controlled Substances Act. 21 U.S.C. § 881(a)(6). During the events that followed, Mr. Fallon indicated that the briefcase and its contents belonged to Mr. Marrocco; the claimants asserted that Mr. Marrocco had given the briefcase and the funds to Mr. Fallon and had instructed him to place the funds in a safe deposit box for Mr. Marrocco's later use.

The claimants moved to suppress the seizure of the funds. The district court granted the motion on March 21, 2005 (the "March 2005 ruling") and simultaneously set a

status hearing for April 1, 2005.[1] It concluded that, although reasonable suspicion justified the temporary detention of the briefcase, Officer Romano's physical search of the briefcase was improper. The Government moved for reconsideration, arguing, among other things, that the suppression of the contents of the briefcase was improper under either the inevitable discovery doctrine or the independent source doctrine. On September 21, 2006, the district court denied the Government's motion for reconsideration (the "September 2006 ruling"), but did not determine ownership of the briefcase.[2]

On April 24, 2007, the claimants filed a motion to determine ownership of the funds. The district court held that the evidence that the dog alerted to the briefcase was not admissible against either of the claimants and concluded that, absent the evidence of the dog alert, the Government had failed to demonstrate a substantial connection between the seized funds and illegal narcotics activity. The court concluded—based on Mr. Marrocco's deposition testimony, his answers to interrogatories and the presumption that the possessor of property that is seized is entitled to its return—that Mr. Marrocco was the lawful owner of the funds. Accordingly, on July 5, 2007, the court ordered the funds returned to Mr. Marrocco.

---

[1] At this time, the court did not enter judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure ("Rule 58").

[2] Again, the court did not enter a Rule 58 judgment. However, it did state that any pending motions were "terminated as moot," and it declared the case "terminated." R.86.

The Government filed this appeal within sixty days of that ruling.

## II

### DISCUSSION

The Government challenges the district court's order requiring the funds to be returned to Mr. Marrocco.[3]

---

[3] The district court had jurisdiction over the civil forfeiture action under 28 U.S.C. § 1355, which provides that "[t]he district courts shall have original jurisdiction . . . of any action or proceeding for the recovery or enforcement of any . . . forfeiture . . . ."

The parties dispute whether this court has jurisdiction over the present appeal. Mr. Marrocco argues that the district court's ruling on the motion to suppress became final on August 22, 2005, 150 days after the March 2005 ruling. *See* Fed. R. Civ. P. 58(c) (indicating that judgment in a civil proceeding is deemed entered either when the judgment is set out in a separate document or 150 days after the judgment is entered in the civil docket). He submits that the September 2006 ruling on the Government's motion for reconsideration merged with the court's March 2005 ruling and became a single, final, appealable order. Mr. Marrocco submits that, because the Government did not appeal within sixty days of that final order, the Government's appeal is untimely. *See* Fed. R. App. P. 4(a)(1)(B) ("When the United States or its officer or agency is a party, the notice of appeal may be filed by any party within 60 days after the judgment or order appealed from is entered.").

(continued...)

3  (...continued)

We do not believe that the March 2005 ruling and the September 2006 ruling constituted final, appealable judgments. In neither of those rulings did the court set out the relief to which the parties were entitled; thus, even though the court stated that the case was "terminated" in September 2006, there was no effectual judgment entered at that time. *See Horn v. Transcon Lines, Inc.*, 898 F.2d 589, 591 (7th Cir. 1990) ("A document saying that judgment is entered, but not saying who is entitled to what from whom, is ineffectual."); *see also Reytblatt v. Denton*, 812 F.2d 1042, 1044 (7th Cir. 1987) ("[The final judgment in a case] must set forth the relief to which the prevailing party is entitled or the fact that the plaintiff has been denied all relief."). Indeed, despite the district court's statements, it appears that the district court contemplated further proceedings would take place. At the time the court granted the claimants' motion to suppress the funds, it simultaneously set a status hearing for April 1, 2005. Furthermore, it recognized on July 5, 2007, that the claimants' motion to determine ownership of the funds was a proceeding in the "forfeiture action brought by the government." R.109 at 1. The March 2005 ruling and the September 2006 ruling properly are viewed as intermediate evidentiary rulings in a larger ongoing case; such rulings are not final judgments. *See In re the Search of 949 Erie St., Racine, Wisc.*, 824 F.2d 538, 540 (7th Cir. 1987) (noting that an order denying the suppression of evidence ordinarily is not appealable, but stating that a motion for the return of seized property *may* be immediately appealable "because such a motion *may* represent the entirety of the case below" (emphasis added)). The district court did not enter a final, appealable judgment until July 5, 2007, when it determined that

(continued...)

It submits that the district court erroneously held that the evidence of the dog's alert to the briefcase was not admissible against Mr. Marrocco.[4] All

---

[3] (...continued)

Mr. Marrocco was entitled to the funds and entered a separate judgment in the forfeiture action. R.110.

[4] As the Government correctly notes, Mr. Marrocco does not have standing to claim that the officers impermissibly detained Mr. Fallon. *See United States v. Torres*, 32 F.3d 225, 229-30 (7th Cir. 1994) ("'It has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure.'" (quoting *United States v. Padilla*, 508 U.S. 77, 81 (1993))). However, Mr. Marrocco may establish that he has standing to challenge the search and detention of the briefcase, provided he can show that he held a legitimate expectation of privacy in the briefcase. *Torres*, 32 F.3d at 230. We conclude that Mr. Marrocco has satisfied that burden.

"A reasonable expectation of privacy is present when (1) the defendant exhibits an actual or subjective expectation of privacy, and (2) the expectation is one that society is prepared to recognize as reasonable." *United States v. Amaral-Estrada*, 509 F.3d 820, 827 (7th Cir. 2007). As the owner of the briefcase, Mr. Marrocco had an objectively reasonable expectation of privacy in the briefcase and its contents. *See United States v. Basinski*, 226 F.3d 829, 835, 838 (7th Cir. 2000) (concluding that the defendant retained a privacy interest in the locked briefcase he entrusted to a friend, *id.* at 838, and noting that "'[f]ew places outside one's home justify a greater expectation

(continued...)

---

[4] (...continued)
of privacy than does the briefcase,' " *id.* at 835 (quoting *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983))); *United States v. Powell*, 929 F.2d 1190, 1195 (7th Cir. 1991) ("Ownership creates, in other words, an expectation of privacy that society is prepared to recognize as 'reasonable.' " (citation and quotation marks omitted)). That Mr. Marrocco subjectively held this expectation is evidenced by the fact that he locked the briefcase, preventing others from opening it and examining its contents. *Cf. Amaral-Estrada*, 509 F.3d at 827 (holding that the defendant had no privacy interest in the car, which he denied owning, when he expected that others would enter the vehicle and take items from or leave items in the vehicle).

Mr. Marrocco's ownership interest was not diminished by the fact that he entrusted the briefcase to the care of another. *See Basinski*, 226 F.3d at 837, 838 (noting that the defendant "demonstrate[d] a strong desire to preserve both his possessory and privacy interests" in his locked briefcase when he entrusted it to a friend and instructed him to hide it, and concluding that the defendant retained a legitimate privacy interest in the briefcase). Thus, even though Mr. Marrocco did not physically control the briefcase, he retained his ownership interest and his attendant expectation of privacy in the case and its contents. This privacy interest was, however, somewhat limited by the fact that Mr. Marrocco caused his briefcase to be placed on a train. Because of that act, Mr. Marrocco could not have expected that his briefcase would not be touched or moved. Nevertheless, he did retain both an expectation of privacy in the contents of his luggage and an expectation that his briefcase would not be seized in an unlawful manner. *See United States v. Guzman*, 75 F.3d 1090, 1095 (6th Cir. 1996) (noting

(continued...)

agree that the officers had reasonable suspicion to detain the briefcase in the first instance. Nor, on appeal, does anyone contend that the officers could have lawfully opened the briefcase. The Government claims, however, that the evidence of the briefcase's contents should have been admitted against Mr. Marrocco because, even without the unlawful search, the officers inevitably would have discovered that the briefcase contained money contaminated by drugs.[5]

When considering a district court's ruling on a motion to suppress, we review the court's legal conclusions de novo, and we defer to the district court's factual findings unless those findings are clearly erroneous. *United States v. Martin*, 422 F.3d 597, 601 (7th Cir. 2005). We evaluate the propriety of the officers' conduct at each stage of the investigation, viewing their actions in light of the totality of the circumstances.[6]

---

[4] (...continued)

that "a passenger on a common carrier has a reasonable expectation that the contents of his luggage will not be exposed absent consent or a search warrant"); *see also Bond v. United States*, 529 U.S. 334, 338-39 (2000) (abrogating our holding in *United States v. McDonald*, 100 F.3d 1320, 1326-27 (7th Cir. 1996), by holding that the physical manipulation of a bus passenger's bag violated the Fourth Amendment).

[5] The Government does not argue that the remedy of suppression is unavailable in forfeiture proceedings brought under 21 U.S.C. § 881.

[6] *See United States v. Martin*, 422 F.3d 597, 601-02 (7th Cir. 2005) (considering the events that led the arresting officer to detain

(continued...)

**A.**

We first consider the officers' initial encounter with Mr. Fallon to determine whether they were permitted to seize and detain the briefcase and its contents.[7] The limited investigative detention of luggage is permissible under the Fourth Amendment where an investigating officer reasonably believes that the luggage contains narcotics. *United States v. Place*, 462 U.S. 696, 706 (1983). The suspicion necessary to justify such an intrusion must amount to "more than a mere hunch," *United States v. LePage*, 477 F.3d 485, 487 (7th Cir. 2007) (citing *United States v. Ganser*, 315 F.3d 839, 843 (7th Cir. 2003)), and cannot be based solely on an officer's conclusion that a suspect fits a drug-courier profile, *United States v. Sterling*, 909 F.2d 1078, 1083 (7th Cir. 1990) (citing *Reid v. Georgia*, 448 U.S. 438, 440-41 (1980) (per curiam)). Instead, the suspicion justifying such conduct must be based on

[6] (...continued)
the defendant, conduct additional investigation, request a background check, and summon a canine unit, and concluding that, "[a]t each stage . . . the additional information obtained justified additional investigation"); *Smith v. Ball State Univ.*, 295 F.3d 763, 768 (7th Cir. 2002) (noting, in determining whether an investigatory stop evolved into an illegal arrest, that "we evaluate the totality of the circumstances of each case, and we examine separately each stage in the encounter").

[7] The district court concluded that the brief detention of the briefcase was justified. At the outset, we consider the reasonableness of the initial detention because it is relevant to the inevitable discovery discussion that follows.

specific, articulable facts which, judged in light of the officers' experience, would justify the intrusion. *United States v. Yang*, 286 F.3d 940, 949 (7th Cir. 2002). However, even when an officer has reasonable suspicion, his ability to detain a suspect's baggage is limited: Any such detention must be reasonable in time and scope given the totality of the circumstances surrounding the investigatory act. *See Sterling*, 909 F.2d at 1085 ("Even if the decision to detain a suitcase is made on the basis of reasonable suspicion, the duration of the detention may abridge constitutional standards.").

With these standards in mind, we turn to the officers' initial questioning of Mr. Fallon. At the time that the officers approached Mr. Fallon's compartment, they knew that Mr. Fallon had purchased a one-way train ticket with cash within a few days of his scheduled departure. These facts, as Officer Romano noted, fit the profile of a drug courier. Nevertheless, the officers reasonably could not have suspected, based on these facts, that Mr. Fallon was carrying drugs or money associated with drugs.[8] Thus, when the officers initially approached Mr. Fallon, they were not permitted to seize or search the briefcase.

---

[8] *See, e.g., United States v. Goodwin*, 449 F.3d 766, 767 (7th Cir. 2006) ("This pattern—last-minute cash purchase of a one-way ticket—is deemed by enforcers of the drug laws to be the profile of a drug courier, though not to establish probable cause or even reasonable suspicion to believe that someone who fits the profile *is* a drug courier." (citation omitted)).

Nevertheless, the events that transpired during the officers' initial encounter with Mr. Fallon gave them sufficient reason to detain the briefcase. The officers noticed that Mr. Fallon began sweating when they asked him whether he was carrying weapons, drugs or large sums of money. Furthermore, Mr. Fallon gave conflicting responses when questioned about the briefcase's contents: He initially denied that he was carrying large sums of money, but later told Officer Romano that the case contained $50,000. Mr. Fallon's demeanor and responses to the officers' questions led the officers to become suspicious not only of Mr. Fallon but also of the contents of the briefcase.[9] The officers were permitted to consider Mr. Fallon's responses and mannerisms, the circumstances surrounding his ticket purchase, their own experience and knowledge, and "the characteristics of persons engaged in illegal activities," when determining whether the briefcase was likely to contain contraband. *Sterling*, 909 F.2d at 1083-84.[10] These facts gave rise to

---

[9] *See United States v. Sterling*, 909 F.2d 1078, 1084 (7th Cir. 1990) (noting that the same facts that justified the detention of the suspect justified the detention of the suitcase itself); *see also United States v. Place*, 462 U.S. 696, 708-09 (1983) ("[W]hen the police seize luggage from the suspect's custody, we think the limitations applicable to investigative detentions of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause.").

[10] In *Sterling*, we concluded that the officers, who were trained to identify drug smugglers on the basis of circumstantial

(continued...)

a reasonable suspicion that the briefcase contained drugs, or money associated with drugs. *United States v. Goodwin*, 449 F.3d 766, 768-69 (7th Cir. 2006) ("The combination of fitting the drug profile and giving a suspicious answer to the question about looking inside his luggage created a reasonable suspicion that the defendant's luggage contained contraband." (citations omitted)).[11] The officers were therefore permitted to detain the briefcase for a reasonable period of time in order to investigate further.

As we already have mentioned, however, it is not enough for the Government to show that the officers reasonably suspected Mr. Fallon of engaging in illegal activity; it must also show that the officers' detention of the suitcase was reasonable under the circumstances. The propriety of such a detention is determined by "balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *United States v. Borys*, 766 F.2d 304,

---

[10] (...continued)

evidence, reasonably could have suspected the defendant of carrying drugs based on (1) her false and suspicious statements and (2) evidence that she conformed to a drug smuggler profile, including evidence that she purchased her ticket with cash. *Sterling*, 909 F.2d at 1084.

[11] *See also United States v. Borys*, 766 F.2d 304, 312 (7th Cir. 1985) ("What fueled the agents' suspicions, and justifiably so, was Borys' lying about how long he had been away rather than the actual length of the stay.").

312 (7th Cir. 1985) (quoting *Place*, 462 U.S. at 703). In conducting this analysis, we may consider a number of factors pertaining to both the intrusion and the counter-vailing government interests. These interests include, among other things, the availability of alternative means of investigation, the extent to which the individual con-tributed to the intrusion, the significance of the offense at issue and the consequences of delaying the investiga-tion. *Goodwin*, 449 F.3d at 770-71.

The Government submits that the officers' detention of the briefcase was reasonable. It does not deny that, as a result of the officers' actions, the briefcase did not reach its intended destination. Instead, it asserts, the officers' actions were reasonable despite those consequences because there were no viable alternatives to detaining the briefcase and removing it from the train for a dog-sniff test. Mr. Marrocco, however, disputes the Government's claim and asserts that a less-invasive alternative was available to the officers. Because Mr. Fallon purchased his ticket two days prior to the train's scheduled departure, Mr. Marrocco submits that the officers could have investigated the circumstances of the purchase at an earlier time, assessed whether Mr. Fallon fit the profile of a drug courier, and arranged for a canine unit to be present at the station upon Mr. Fallon's arrival. Mr. Marrocco maintains that the availability of this alter-native, less-invasive means of investigation renders the officers' conduct unreasonable.

In support of this argument, Mr. Marrocco points to our opinion in *Goodwin*, 449 F.3d at 772. In that case, the

arresting officers seized the defendant's luggage, removed it from the train and subjected it to a dog-sniff test because they reasonably suspected the defendant to be carrying contraband; however, the defendant in that case, unlike Mr. Fallon, did not purchase his train ticket until the morning of his departure. *Id.* at 767-69. In affirming the denial of the defendant's motion to suppress, we found the timing of the defendant's purchase to be significant: Because the defendant bought his ticket an hour before departure, the only feasible means of investigating the luggage was to remove it from the train. *Id.* at 771.

Mr. Marrocco urges that, under *Goodwin*, the officers were required to have a canine unit waiting at the platform at the time of Mr. Fallon's arrival; we disagree. Even if the officers could have arranged for a canine unit to be at the station on the day of Mr. Fallon's departure, we cannot accept Mr. Marrocco's suggestion that our holding in *Goodwin* required them to do so. In *Goodwin*, we noted that, "[i]f the defendant had bought his ticket a week in advance and the police had known then that he fit the profile of a drug courier, [the police] could have arranged for [the dog] to be at Union Station when the train was scheduled to depart." *Id.* at 771. Contrary to Mr. Marrocco's arguments, that statement was simply a hypothetical example used to explain why the timing of the defendant's arrival was important *in that case*. Although, under the *specific facts* of *Goodwin*, we concluded that the defendant's tardiness excused the officers' failure to have a canine unit present at the station, it does not necessarily follow that, in *any* case where a

suspect's travel plans are known in advance, officers *must* make arrangements to have a canine unit at the ready.

The Supreme Court's opinion in *United States v. Place*, 462 U.S. 696, 709 (1983), is not to the contrary. In that case, federal narcotics agents became suspicious of the defendant's behavior at the Miami International Airport. Because the Miami agents did not have time to search the defendant's bags prior to his flight's departure, the agents relayed their information to Drug Enforcement Administration ("DEA") authorities in New York. *Id.* at 698. When the defendant's flight landed in New York, two DEA agents seized the defendant's luggage and took it to another airport for a dog-sniff test. *Id.* at 699. The Court found the ninety-minute detention between the seizure and the dog-sniff test to be unreasonable. *Id.* at 709-10. After stating that, "in assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation," the Court criticized the officers' failure to arrange for a drug-sniffing dog to be present at the airport terminal, even though they had the time and opportunity to do so. *Id.* at 709.

We do not read *Place* as requiring that officers *must* arrange for a canine unit to be present at a particular location *whenever* they have time to make such arrangements prior to a suspect's arrival. Indeed, although it may have been reasonable for the officers to have made such arrangements under the facts in *Place*, it does not necessarily follow that it would have been reasonable for the officers to arrange for a canine unit to be present at the station in this case. In *Place*, the DEA agents knew,

prior to the defendant's arrival, that the defendant's actions and statements had caused the Miami agents to suspect that the defendant might have been carrying drugs. *Id.* at 698. In this case, by contrast, the only information that the officers had prior to Mr. Fallon's arrival was that his ticket purchase conformed with a drug-courier profile; they had not had the opportunity to observe his actions or demeanor, and, in fact, they did not even know whether Mr. Fallon was carrying luggage.

Rather than setting forth a bright-line rule that a canine unit must be on-hand whenever police have advance notice of a suspected drug courier's arrival, *Place* and *Goodwin* simply recognize that we must assess the reasonableness of a particular seizure by looking to a number of factors that will vary from case to case. *Id.* at 709-10; *Goodwin*, 449 F.3d at 771-72. This flexible, fact-based approach allows us to consider the many factors that may impact the reasonableness of an officer's decision to summon—or not to summon—a canine unit. We recognize that, even when investigatory officers would prefer to station a canine unit in a particular area, it will not always be possible for them to do so. Many factors could contribute to the availability of a canine unit. *See Borys*, 766 F.2d at 314. For example, in some jurisdictions, the demand for such units may exceed their availability. *Goodwin*, 449 F.3d at 771 ("And apparently there aren't enough of these highly trained dogs to have one tethered at every bus station, train station, and airport in Chicago."). In addition, officers may have difficulty predicting precisely when and where a canine unit will

be required. *See Borys*, 766 F.2d at 314 (noting that agents cannot "predict precisely when they [will] require the services of a dog, for they do not have cause to suspect passengers on every flight they have under surveillance"). Furthermore, it may be that a particular location would not be suitable for a dog-sniff test. *Goodwin*, 449 F.3d at 771 ("A sniffer dog might not do his stuff in the unfamiliar setting of a train's interior."). Other considerations that are unrelated to the availability of a canine unit may also impact whether it is feasible for an officer to obtain such a unit at a particular time. *See, e.g., Sterling*, 909 F.2d at 1085 (noting that it was not feasible for an agent to leave to summon a canine unit). This flexible approach allows us to consider these and other factors when considering whether a particular search or seizure is reasonable. *See Goodwin*, 449 F.3d at 771-72 (recognizing that the need for a stop depends on, among other factors, the seriousness of the offense, the consequences of delay, the likelihood of the suspect's involvement in the offense, the risk of imminent departure, the availability of alternative means of investigation and the length of the detention).

We believe that the officers acted reasonably when they removed the briefcase from the train in order to conduct a dog-sniff test. The information that the officers possessed prior to their initial encounter with Mr. Fallon was not so persuasive as to justify having a canine unit at the ready prior to Mr. Fallon's arrival. The officers knew only that the circumstances surrounding Mr. Fallon's ticket purchase fit a drug-courier profile; this

information, as we already have mentioned, amounted to less than a reasonable suspicion that Mr. Fallon was involved in transporting drugs or drug proceeds. Given law enforcement's interest in conserving resources and avoiding unnecessary procedures, we do not think that it was unreasonable, in this case, for the officers to refrain from arranging the dog-sniff test until after they had interacted with Mr. Fallon, observed his responses and were able to draw some conclusions about the nature of his activities.[12]

In addition, the officers acted with reasonable promptness: Although Mr. Fallon purchased his ticket on December 4, the officers did not learn of his purchase until December 6, the day his train was scheduled to depart. Shortly after the officers learned of the suspicious nature of Mr. Fallon's ticket purchase, they investigated further. Once the officers reasonably suspected that Mr. Fallon was carrying money associated with drugs, they removed the briefcase from the train, took it to their office and arranged for the dog-sniff test, which took place within a reasonable time period. There is no suggestion that the officers unnecessarily delayed carrying out that test, nor is there any indication that the officers engaged in any deliberate misbehavior intended to

---

[12] *See Borys*, 766 F.2d at 314 (suggesting that the failure to have a canine unit immediately available may not be unreasonable where officers are "unsure where and when they might spot someone behaving in a manner to justify detaining the suspect's luggage").

delay Mr. Fallon unnecessarily. We therefore conclude that, based on the information available to the officers, the timeliness of their response, and the serious nature of the suspected crime, the officers behaved reasonably by removing the briefcase from the train and arranging a dog-sniff test soon thereafter.

**B.**

Our conclusion that the officers were permitted to seize the briefcase and remove it from the train does not end our inquiry. After the officers removed the briefcase, and before they obtained a warrant or even probable cause to search it, Officer Romano opened the briefcase and observed its contents. There is no doubt that this warrantless search was constitutionally impermissible. We therefore must determine the constitutional significance of that unlawful search on our analysis.

Mr. Marrocco contends that, because of the unlawful search, the results of the dog-sniff test and the evidence of the briefcase's contents, drug-tainted money, must be suppressed. He asserts that there is no way to determine whether the officers would have discovered the funds, or the connection between the funds and any illegal activity, in the absence of the unlawful conduct. The Government, however, maintains that the district court erred in suppressing the evidence of the results of the dog-sniff test. Although it admits that the officer's visual inspection of the contents of the briefcase was improper, it contends that the challenged evidence

should have been admitted under the inevitable discovery doctrine.[13]

The doctrine of inevitable discovery provides that illegally obtained evidence will not be excluded if the Government can prove, by a preponderance of the evidence, that the officers "ultimately or inevitably would have . . . discovered [the challenged evidence] by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). To satisfy this burden, the Government must demonstrate that two

[13] Contrary to Mr. Marrocco's assertions, we conclude that the Government adequately preserved this issue for appeal. It is true that the Government failed to use the exact term "inevitable discovery" in its arguments before the district court. The Government's failure to invoke that particular term, however, does not render the Government's inevitable discovery argument "so wanting that we should find forfeiture." *United States v. Roque-Espinoza*, 338 F.3d 724, 727 (7th Cir. 2003) (concluding that the defendant did not forfeit his argument even though his motion and supporting memorandum "did not in so many words allege a due process violation"). In its response to the motion to suppress, the Government argued that Mr. Fallon consented to the search of the briefcase. R.45 at 12-13. It then argued, in the alternative, that (1) the "finding of currency in the bag was not a ground for detention for the dog sniff test," *id.* at 13, and (2) the results of the dog-sniff test and other facts gave the officers independent probable cause to believe that the briefcase was associated with drugs, *id.* at 13-15. Although this argument is somewhat underdeveloped, it sufficiently establishes the Government's contention that, even if Mr. Fallon did not consent to the search, the results of the dog-sniff test were nonetheless admissible.

criteria are met: First, it must show that it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence;[14] second, the Government must demonstrate that it would have conducted a lawful search absent the challenged conduct.[15] *See United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995) ("[W]hat makes a discovery 'inevitable' is not probable cause alone . . . but probable cause plus a chain of events that would have led to a warrant . . . independent of the search."). The Government submits that it has satisfied both of these criteria: It asserts that, even absent the challenged conduct, there is no doubt that the officers would have subjected the briefcase to a dog-sniff test. It further claims that, after learning the results of that test, the officers certainly would have applied for and obtained a warrant to search the briefcase.

We agree with the Government that the officers inevitably would have discovered both the funds and the evidence that the funds were associated with narcotics. The first prong of the inevitable discovery test has been met

---

[14] We have held that an independent justification exists when, for example, officers had probable cause justifying a search incident to an arrest. *See United States v. Jones*, 72 F.3d 1324, 1333-34 (7th Cir. 1995).

[15] *See id.* at 1330 n.8 ("[W]hether authorities would in fact have conducted a lawful search is a question distinct from whether they would have had probable cause to do so; that is, probable cause to search does not alone render discovery of the evidence in question inevitable." (citations omitted)).

because the officers could have obtained, based on the results of the dog-sniff test, an independent legal basis for searching the briefcase; namely, the results of the dog-sniff test[16] would have supported the issuance of a warrant. *See United States v. Washburn*, 383 F.3d 638, 643 (7th Cir. 2004) ("[W]e have held that a positive alert by a trained drug dog gives rise to probable cause to search a vehicle." (citations omitted)).[17] Mr. Marrocco claims that we cannot rely on the results of the dog-sniff test because it is not clear that the officers would have ordered that test in the absence of the illegal search. We disagree. At the time the search took place, the officers already knew that the briefcase contained a large sum of money; Mr. Fallon had told them this much when he stated that the briefcase contained $50,000. The unlawful search of the briefcase yielded nothing more than a confirmation of Mr. Fallon's earlier admission.[18]

---

[16] Because the dog-sniff test in fact was performed, we can be certain that the canine unit would have alerted to the contents of the briefcase.

[17] *See also, e.g., United States v. Ganser*, 315 F.3d 839, 844 (7th Cir. 2003) ("Once the canine alerted to the letter, reasonable suspicion was elevated to probable cause." (citations omitted)); *United States v. Thomas*, 87 F.3d 909, 912 (7th Cir. 1996) ("Of course, once the dog reacted positively for narcotics, the officers had probable cause to obtain a search warrant for the suitcase . . . .").

[18] Indeed, it is difficult for us to see how the illegal search was in any way exploited to discover the necessary evidence linking

(continued...)

This is not a case where the investigating officers learned new information during an illegal search and, based on that information, took investigatory steps that they would not have taken otherwise.[19] Instead, after performing the illegal search, the officers did no more than they ordinarily would have done when confronted with a suspected drug courier. There is relevant and probative evidence that suggests the officers would have performed the dog-sniff test as a matter of course: First, and most importantly, the officers already had reliable information about the contents of the briefcase; Mr. Fallon had informed them that the case contained a large sum of money. Thus, the purpose of the officers' investigation was not to discover the contents of the briefcase, but, instead, to determine whether there was a link between those contents and illegal narcotics. Because this link could not be established by merely observing the funds, it is certain that the officers would have conducted some test aimed at establishing that connection.

Furthermore, the officers already had removed the briefcase from the train and taken it back to the office

---

[18] (...continued)
Mr. Fallon and the bag to illegal drugs. *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). *See also infra* p.32-33.

[19] *Cf. United States v. Thomas*, 955 F.2d 207, 210-11 (4th Cir. 1992) (concluding that discovery was not inevitable where police first unlawfully searched the defendant's hotel room and then set up surveillance to monitor the hotel room).

for the purpose of subjecting the briefcase to a dog-sniff test.[20] Additionally, although the officers had not summoned the canine unit at the time of the unlawful search, they did do so shortly thereafter. Finally, after Officer Romano impermissibly opened the briefcase, he quickly shut it, an act likely intended to prevent any odor on the funds from dissipating. Officer Romano did not rummage through the contents of the briefcase in search of obvious contraband, nor did he attempt to exploit the results of the unlawful search. We can conclude, based on all of this evidence, that the officers detained the briefcase in order to conduct an investigation that would establish a link between the funds and illegal activity, rather than to determine the contents of the briefcase, which, as we have mentioned, were already known. We therefore have no difficulty in concluding that the dog-sniff test would have been performed absent the illegal search, and that the results of that test would have supported a warrant application.

---

[20] Officer Terry testified as follows:

> Q. Now, the purpose of getting off the train and going to the office is to investigate the money, is that correct?
>
> A. Correct.
>
> Q. And the purpose of investigating the money is accomplished by bringing it to the office for a dog sniff, is that right?
>
> A. Through conversation, that's determined later, yes, sir.

R.49-2 at 83.

The fact that the results of the dog-sniff test would have supported a warrant is not sufficient, however; the Government must also show, under the second prong of our inevitable discovery inquiry, that the officers inevitably would have sought the warrant and conducted a lawful search. In this circuit, when the Government seeks "to use the doctrine of inevitable discovery to excuse its failure to have obtained a search warrant," it must "prove that a warrant would certainly, and not merely probably, have been issued had it been applied for." *United States v. Tejada*, 524 F.3d 809, 813 (7th Cir. 2008).

We are convinced that the Government has satisfied this burden.[21] Our case law establishes that the inevitable discovery rule applies in cases, such as this one, where investigating officers undoubtedly would have followed routine, established steps resulting in the issuance of a warrant. *See, e.g., id.* (concluding that the evidence of the container's contents was admissible, even

---

[21] Mr. Marrocco protests that we cannot know that the officers inevitably would have obtained a warrant because the officers were not in the process of obtaining, and ultimately did not obtain, a warrant; it is clear from our case law, however, that the Government is not required to show that investigators *in fact* obtained or sought a warrant in order to prove that they *inevitably would have* done so. In fact, we have explicitly rejected a rule that "would allow the doctrine to be invoked only if the police were in the process of obtaining a warrant," concluding that such a rule would be "untenable." *United States v. Tejada*, 524 F.3d 809, 813 (7th Cir. 2008).

though the officers did not obtain a warrant to search the container, because there "[was not] even the shadow of a doubt that had they applied for a warrant to search the bag, . . . the warrant would have been issued"); *United States v. Buchanan*, 910 F.2d 1571, 1573 (7th Cir. 1990) (determining that the police inevitably would have sought a warrant to search the defendant's hotel room, pursuant to "proper and predictable police investigatory procedure[]," where the defendant was arrested on an outstanding murder warrant and the murder weapon had not yet been found (alteration in original) (citation omitted)).[22] As we already have discussed, the officers certainly would have subjected the briefcase to a dog-sniff test even absent the illegal search. After the test was performed, the officers would have known (1) that Mr. Fallon fit a drug-courier profile; (2) that Mr. Fallon had admitted that the briefcase contained a large sum of

---

[22] We also have applied this reasoning when the challenged evidence would have been discovered through a means other than a search warrant. For example, in *United States v. Johnson*, 383 F.3d 538 (7th Cir. 2004), we noted that the evidence discovered during an illegal search of the trunk of the defendant's car inevitably would have been discovered during the routine, permissible inventory search that would have followed the defendant's arrest. *Id.* at 545 n.8 ("Therefore, assuming *arguendo* that Cook did not initially have probable cause to search the trunk, after legally arresting Johnson on the outstanding warrant, the firearm would have nevertheless been discovered later when the police took possession of the vehicle he was driving and performed an inventory search, thus rendering the firearm admissible at trial.").

money; and (3) that the dog-sniff test indicated that the briefcase carried the odor of drugs. It would be unreasonable to conclude that, after discovering all of this information, the officers would have failed to seek a warrant. *See Buchanan*, 910 F.2d at 1573 (concluding that police inevitably would have sought a warrant to search the room, as "it would have been foolish not to want to look for the gun there"); *see also United States v. Allen*, 159 F.3d 832, 841 (4th Cir. 1998) ("The inevitable discovery doctrine may apply where additional routine or factually established investigative steps would inevitably lead to discovery of the evidence without undertaking any search." (citations omitted)). In addition, as we already have recognized, there is no serious question that the warrant would have been issued once sought.[23] Therefore, we may conclude that the officers inevitably would have had a lawful basis for discovering both the funds and the link between the funds and illegal narcotics activity.[24]

---

[23] There is no contention in this case that, for example, the dog that performed the sniff test was unreliable.

[24] We have recognized that the standard employed in this circuit is an "intermediate" one, *Tejada*, 524 F.3d at 813, which differs somewhat from the tests employed by our sister circuits. The Second and Tenth Circuits, for example, will only apply the inevitable discovery doctrine where there exists evidence from which "a court can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." *United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006); *see*

(continued...)

[24] (...continued)
*also United States v. Souza*, 223 F.3d 1197, 1205 (10th Cir. 2000) (applying the "high level of confidence" standard). Other courts of appeals, by contrast, apply a somewhat lower standard, requiring only a "reasonable probability" that the challenged evidence would have been discovered lawfully. *See Heath*, 455 F.3d at 60 (citations omitted) (collecting cases).

The effect of this difference in verbal formulation is evident in the circuits' differing analysis of cases where the Government seeks to use the inevitable discovery doctrine to excuse a failure to seek a warrant: In *Tejada*, we observed that cases from some courts of appeals suggest that the inevitable discovery doctrine "should be confined to the situation in which the police are gathering evidence with a view toward obtaining a search warrant and it is certain or nearly so that . . . the investigation would have culminated in a successful warrant application." *Tejada*, 524 F.3d at 812-13 (citing *United States v. Virden*, 488 F.3d 1317, 1323 (11th Cir. 2007); *United States v. Conner*, 127 F.3d 663, 667-68 (8th Cir. 1997); *United States v. Mejia*, 69 F.3d 309, 320 (9th Cir. 1995)). Other appellate courts, however, apply a more flexible approach. *See, e.g., United States v. Ford*, 22 F.3d 374, 377 (1st Cir. 1994) (noting that court's rejection of an ongoing-investigation requirement and its adoption of a "flexible standard" under which "[t]he specific facts of each case will determine the requirements necessary to prove independence and inevitability"); *Thomas*, 955 F.2d at 210-11 (rejecting a "blanket requirement" that officers be pursuing an alternate investigation, and instead requiring, at minimum, that discovery "arise from circumstances other than those disclosed by the illegal search itself" (citation and quotation marks omitted)); *United States v. Garcia*, 496 F.3d 495, 506

(continued...)

[24] (...continued)
(6th Cir. 2007) (noting that the inevitable discovery doctrine "applies where the facts indicate that the officers inevitably would have discovered and seized the tainted evidence by following 'routine procedures'" (quoting *United States v. Vite-Espinoza*, 342 F.3d 462, 466 (6th Cir. 2003))).

We believe that, given the facts of this case, our holding would be the same even if we applied one of these other approaches. Under the flexible approach, we may conclude, based on the results of the dog-sniff test and the officers' actions, that the officers would have had probable cause to search the briefcase, and that a warrant would have issued as a result. *See Ford*, 22 F.3d at 378 (concluding that, where the officers had independent probable cause to search the defendant's home, "[it was] inevitable that the existence of probable cause would find fruition in the issuance of a search warrant," and noting that this conclusion was bolstered by evidence that the decision to seek a warrant already had been made); *see also Garcia*, 496 F.3d at 506 (concluding that the officers inevitably would have discovered the defendant's pager because, after searching his vehicle, they would have had probable cause to arrest the defendant, and they would have discovered the pager during the "routine procedure of searching [him] prior to taking him into custody" (citation and quotation marks omitted)); *United States v. White*, 326 F.3d 1135, 1138-39 (10th Cir. 2003) (determining, based on evidence that the officer ran several detained individuals' names through a database, that there was "a solid implication that the officers routinely ran [such] checks on persons briefly detained," and concluding that the officers would have run such a check on the defendant and discovered his prior conviction); *cf. United*

(continued...)

Indeed, even if the inevitable discovery doctrine was waived or inapplicable, we would have to conclude that the results of the dog-sniff test were admissible. The

---

[24] (...continued)

*States v. Allen*, 159 F.3d 832, 839-40 (4th Cir. 1998) (stating that the court had "little trouble" with the district court's finding that, had a dog-sniff test been performed, the dog would have alerted to the bag and the police would have had probable cause for a search warrant, but concluding nevertheless that the inevitable discovery rule did not apply because there was no evidence that the officer would have used a dog to investigate the bag).

Even if we were to require a high level of confidence that the warrant inevitably would have been issued, the Government has carried that burden here. At the time of the unlawful search, the officers were conducting an investigation that logically would have culminated in the discovery of the odor of the drugs on the money; that discovery would have been made even absent the illegal conduct, and the probability is therefore "very high that the evidence would have been discovered pursuant to a search warrant." *Souza*, 223 F.3d at 1205-06 (concluding that the inevitable discovery doctrine applied because the officers took steps to prepare a warrant prior to the search, the officers had probable cause to believe the package contained contraband, a narcotics dog alerted to the container, and a warrant ultimately was issued). In this case, the inevitability of the warrant's issuance is clear from the facts. *See Heath*, 455 F.3d at 62, 62 n.11 (remanding for further findings to assess whether an arrest would have been made absent the unlawful conduct, but noting that "[t]here obviously will be some [cases] in which the inevitability of the arrest is sufficiently obvious as not to require discussion").

illegality of Officer Romano's opening of the briefcase with a knife had no effect on the subsequent discovery that the money was tainted by drugs. The officers already knew of the presence of the money. Opening the briefcase gave them no knowledge about whether the money was tainted. That knowledge was completely dependent on the dog-sniff test. Therefore, the causal connection between the illegality of Officer Romano's search was so far attenuated from the crucial evidence as to make invocation of the suppression doctrine inappropriate. *See United States v. Carter*, No. 09-1608, slip op. at 7-8 (7th Cir. July 20, 2009); *United States v. Ienco*, 182 F. 3d 517, 526 (7th Cir. 1999); *see also Brown v. Illinois*, 422 U.S. 590, 609 (1975) (Powell, J., concurring); *United States v. Fazio*, 914 F.2d 950, 957 (7th Cir. 1990).

Accordingly, we hold that the district court improperly suppressed the evidence of the contents of the briefcase and the results of the dog-sniff test.

## Conclusion

For the reasons set forth in this opinion, we reverse the decision of the district court and remand this case for further proceedings consistent with this opinion. On remand the district court may hear additional evidence as to whether the funds are subject to forfeiture and, if necessary, as to the ultimate ownership of the funds.

REVERSED and REMANDED

EASTERBROOK, *Chief Judge*, concurring. I join the court's opinion without reservation but add a few words about an issue that, as the court notes (slip op. 10 n.5), the litigants have overlooked.

All parties assume that the exclusionary rule applies to forfeiture, so that the *res* must be returned if it was improperly seized. Yet the Supreme Court has twice held that the exclusionary rule is not used in civil proceedings. See *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984) (deportation); *United States v. Janis*, 428 U.S. 433 (1976) (taxation). See also *Pennsylvania Board of Probation & Parole v. Scott*, 524 U.S. 357 (1998) (rule inapplicable to probation revocation). Although *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693 (1965), suppressed evidence in a forfeiture, *Janis* stated that this was because that forfeiture was intended as a criminal punishment. 428 U.S. at 447 n.17. The forfeiture in our case is civil. It is farther from a criminal prosecution than is a probation-revocation proceeding.

Suppressing the *res* in a civil proceeding, even though the property is subject to forfeiture, would be like dismissing the indictment in a criminal proceeding whenever the defendant was arrested without probable cause. The Supreme Court has been unwilling to use the exclusionary rule to "suppress" the body of an improperly arrested defendant. See *United States v. Alvarez-Machain*, 504 U.S. 655 (1992). Why then would it be sensible to suppress the *res*?

The appropriate remedy is civil damages measured by the value of the privacy interest wrongly invaded. Exclu-

sion sometimes may be appropriate in criminal prosecutions, but damages are the best remedy in the run of situations. See *Hudson v. Michigan*, 547 U.S. 586 (2006); *Herring v. United States*, 129 S. Ct. 695 (2009). This case illustrates why: the value of the *res* is about $121,000, exceeding any plausible estimate of the injury inflicted by opening the case before the dog arrived. Awarding claimants $121,000 would both overcompensate them and overdeter law-enforcement agents—just as awarding excessive damages in tort suits warps the incentives of both potential victims and potential injurers, leading potential victims to take excessive risks and potential injurers to take excessive (*i.e.*, unjustifiably expensive) precautions.

Because the United States has not questioned the use of the exclusionary rule, and the issue does not affect subject-matter jurisdiction, we need not decide what scope *Janis*, *Lopez-Mendoza*, *Hudson*, and *Herring* leave for *One 1958 Plymouth Sedan*.